UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| V. | § § | CAUSE NO. 1:21-CR-327-RC-1 |
| LUKE RUSSELL COFFEE | § § | |

**SUPPLEMENT TO DEFENDANT'S OPPOSED MOTION TO
MODIFY PRETRIAL CONDITIONS OF RELEASE**

TO THE HONORABLE RUDOLPH CONTRERAS, DISTRICT JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA:

COMES NOW Defendant, Luke Russell Coffee, by and through his attorney of record, John J. Velasquez, hereby files this Supplement to Defendant's Opposed Motion to Modify Pretrial Conditions, and would show this Honorable Court as follows:

Luke Coffee has no criminal record. He has never been violent. He is not a flight risk, nor a danger to the community. He has very strong ties to his company and family in Dallas, Texas.

The restrictions requiring that Luke Coffee wear a GPS monitor and remain in home confinement, except for certain preapproved exceptions, are affecting his business financially. The restrictions prevent Luke Coffee from having business dinner meetings with clients and customers and/or potential clients and customers. This is how Luke Coffee conducts a lot of his business.

His business also requires him to travel and stay overnight in Dallas, Texas and several other towns and cities throughout Texas and several states. The restrictions prevent Luke Coffee from doing this.

Also, this case has been pending for approximately 15 months, and trial has not yet been scheduled. It may be several more months before this matter goes to trial.

Furthermore, Luke Coffee provides the attached Reply to the Government's Supplemental Memorandum in Support of Pretrial Detention. Said Reply was previously filed in this matter by Luke Coffee's previous defense attorney.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

/S/ JOHN J. VELASQUEZ
Assistant Federal Public Defender
Western District of Texas
200 East Wall St., Room 110
Midland, Texas 79701
Tel.: (830) 308-6040
Bar Number: Nebraska 18183

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

  I hereby certify that on the 21st day of April 2022, I electronically filed the foregoing Supplement to Defendant's Motion to Modify Pretrial Conditions of Release with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Peter Lallas
Assistant United States Attorney

            /s/ JOHN J. VELASQUEZ
            *Attorney for Defendant*

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : No. 21-MJ-236 |
| | : |
| LUKE RUSSELL COFFEE, | : |
| Defendant. | : |

## REPLY TO THE GOVERNMENT'S SUPPLEMENTAL
## MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION

TO THE HONORABLE JUDGE BERYL HOWELL: NOW COMES Defendant Luke Coffee, through his attorney Jim Burnham, and respectfully files this Reply To The Government's Supplemental Memorandum In Support Of Pre-Trial Detention, submits the following:

*I.*

The Government failed to justify Luke Coffee's detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142.

> (3) determined the district court did not demonstrate that it 'adequately considered, in light of all the record evidence,' whether defendants, who were a part of the mob assault on the Capitol, illegally entered the Capitol, carried weapons onto Capitol grounds, and showed no remorse for their actions, but had limited criminal history, . . . presented 'an identified and articulable threat to the community,'" Minute Order (citing *Munchel*, 2021 WL 1149196, at *7-8).

Government failed to adequately demonstrate, in light of all record evidence, whether Luke Coffee presents an identified and articulable threat to the community.

The Government failed to prove that Luke Coffee by clear and convincing evidence that Luke Coffee presents an identified and articulable threat to an individual and the community. Therefore, to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual and the community.

Further, Luke Coffee argues that the Government's proffer of dangerousness should be weighed against the fact that the government did not seek detention of defendants who admitted they pushed through the police barricades and defendants charged with punching officers, breaking windows, discharging tasers at officers, and with planning and fundraising for the riot. See Munchel Reply Mem. At 9-12.

Further, the Government failed to prove by clear and convincing evidence that the determination of a threat has been made individually based on the evidence which is before the court regarding Luke Coffee.

Further, the Government failed to prove by clear and convincing evidence that the threat posed by Luke Coffee to an individual or the community that presents a demonstrable danger to the community.

Further, the Government failed to prove by clear and convincing evidence that the Court is unable to disable Luke Coffee from executing the alleged threat posed by Luke Coffee to an individual or the community.

Further, the Government failed to explain how it reached the conclusion, that any violence committed by Luke Coffee on January 6, either poses an alleged threat of "using force to promote his political ends" or poses a threat of committing violence in the future.

Further, the Government failed to prove by clear and convincing evidence that Luke Coffee was in a different class of dangerousness from Munchel because the FBI videos show that Luke Coffee qualified for the Munchel class or his own separate class as being one of four non-violent peacemakers that broke up the violent confrontations between the Capitol Police and the violent attackers of the Capitol Police at the entrance of the Lower Terrace Tunnel entrance.

Further, the Government failed to prove by clear and convincing evidence that the future misconduct that is anticipated of Luke Coffee concerns "violent criminal activity" as defined in U.S. V. Simpkins, 826 F.2d at 96 in a proper dangerousness determination to justify detention.

Further, the Government failed to prove by clear and convincing evidence that on January 6, that Luke Coffee had any interest to storm the Capitol or to being part of the violent attackers or to threaten the peaceful transfer of power or to obstruct the electoral college vote.

> (4) required that any 'threat be considered in context,' . . . such that the district court must consider 'the nature of the threat identified and the resources and capabilities of the defendant' to carry out that threat," Minute Order (citing *Munchel*, 2021 WL 1149196, at *7-8).

> (6) directed the district court to consider whether defendants pose such a threat outside of the specific context 'of a large group of people who had gathered at the Capitol in protest that day' on January 6th, 2021, since 'the presence of the group was critical to their ability to obstruct the vote and to cause danger to the community,' . . . and 'there was no explanation of how [defendants] would be capable of doing so now that the specific circumstances of January 6 have passed,'" Minute Order (citing *Munchel*, 2021 WL 1149196, at *8).

The Government's assertions that Luke Coffee poses an ongoing threat to the community fail as unsupported speculations and misinterpretations. Luke Coffee did not use a dangerous weapon on Capitol grounds. Luke Coffee had no connection with the violent attackers and pleaded

that they "STOP" 4 times and "PRAY" 9 times. The "law enforcement officer who was brutally beaten and tased by assailants" was dragged into the crowd long before Luke Coffee went forward to break up the insurrection. Luke Coffee is in a separate class from the violent attackers in the FBI videos.

The Government argues the crutch is a dangerous weapon. Under the relevant statute, 40 U.S.C. § 5104 (a)(2)(A) (See Exhibit A), does not state the crutch is a dangerous weapon.

Luke Coffee never used the crutch as a "dangerous weapon." 18U.S.C. § 111(b), refer to ECF, Document 13, pages 20-22.

## II.

**Luke Coffee's actions on January 6, 2021 or the weeks following, and the testimonies from the March 8, 2021 detention hearing and the pretrial services report all demonstrate that Luke Coffee is not a danger to the community and any person (pages 1-3).**

a. On January 6, 2021 Luke Coffee acted as a peacemaker and urged the rioters to "Stop" and "Pray."
   - The clip of the discovery video from Social Media [1 hour, 14 minutes, 16 seconds mark to 40 seconds mark] shows Luke saying stop and pray and it is audible.
   - FBI Special Agent Hillman testified that Luke Coffee was saying stop and pray multiple times:
     **Burnham:** Okay. We're going to play it again. Now, Officer, did Luke Coffee in that video yell to the crowd, Stop, stop, stop, stop, four times?
     **Hillman:** Yes, sir, that's what it sounded like he was saying.
     **Burnham:** Okay. Did he say, Pray -- stop -- pray, pray, pray, pray, pray, pray, pray, pray, pray --nine times?
     **Hillman:** I don't know how many times it was, but it was multiple times is what it sounded like, yes, sir.[1]

   - Special Agent Hillman testified that when he spoke to Luke Coffee on January 13, 2021, he told Luke Coffee that it looked like he was "trying to help stop it all."[2]

b. Luke Coffee's is not a member of any radicalized organizations such as Proud Boys, VSC-131, the Three Percenters, and others.

c. Luke Coffee's comments on Conspiracy Castle were merely bravado and two of the Conspiracy Castle interviews occurred after Luke Coffee was in contact with Special Agent Mike Hillman on January 13, 2021 and had been told that he was not a suspect.

   - The Government is misconstruing the statements in the Conspiracy Castle videos with Luke Coffee.

---

[1] Transcript of March 8, 2021 Detention Hearing, Page 82. Lines 4-19
[2] Transcript of March 8, 2021 Detention Hearing, Page 82. Lines 4-19.

- The "nature and seriousness" of Coffee statements in the interviews are bravado, exaggerated, and for entertainment.
- The intent of "Conspiracy Castle," as stated in the video admitted as Government Exhibit 7, is for "entertainment purposes only."

d. Luke Coffee does not own a firearm and has not attempted to purchase one.
- The Magistrate Court summarized Luke Coffee's actions and intent thus:
  - "There is no evidence that Mr. Coffee has, in fact, obtained a firearm or attempted to do so or has any real or specific plans to engage in any further confrontations with law enforcement…in actuality, Mr. Coffee hired a lawyer and turned himself in and gave consent to search his vehicle."[3]

e. History and Characteristics of Luke Coffee.
- Luke Coffee has no prior criminal history
- Pretrial Services stated,
  - "…defendant stated he has daily contact with both of his parents who reside in Tool, Texas. The defendant reported bi-weekly contact with his brothers, Ben Coffee and Nate Coffee, who both reside in Dallas, Texas. The defendant related he has weekly contact with his sister, Helen Coffee, who resides in Marble Falls, Texas…The defendant's personal history and familial ties were verified by the defendant's mother, Marybeth Coffee, via telephone."[4]
- Since 2009 Luke Coffee has been the owner of Coffee Productions Inc. based in Dallas.[5]
- Six (6) witnesses testified and nine (9) proffered witnesses that Luke Coffee poses no flight risk or threat to the community and any person.

  - Helen Coffee, sister of Luke Coffee.[6]
  - Herb Thomas, lifelong friend of Luke Coffee and owner of a Dallas Law Firm.[7]
  - Lindsey Collins, lifelong friend of Luke Coffee.[8]
  - Andrew Prine, friend of Luke Coffee for 22 years.[9]
  - Travis Barnes, friend of Luke Coffee for 24 years.[10]
  - Russell Coffee, Jr., father of Luke Coffee.[11]

---

[3] Transcript of March 8, 2021 Detention Hearing, Page 169
[4] Pretrial Services Report of March 5, 2021, Page 2
[5] Pretrial Services Report of March 5, 2021, Page 3
[6] Transcript of March 8, 2021 Detention Hearing, Page 108 Line 22-25 and Page 109 Lines 1-5
[7] Transcript of March 8, 2021 Detention Hearing, Page 119 Lines 20-24
[8] Transcript of March 8, 2021 Detention Hearing, Page 131 Lines 21-25 and Page 132 Lines 3-6
[9] Transcript of March 8, 2021 Detention Hearing, Page 135 Line 16-20
[10] Transcript of March 8, 2021 Detention Hearing, Page 141 Line 7-15
[11] Transcript of March 8, 2021 Detention Hearing, Page 144 Line 7-12

### III.

**Luke Coffee's actions on January 6, 2021 or the weeks following, the testimonies from the March 8th detention hearing and the pretrial services report all demonstrate that Luke Coffee is not a flight risk (pages 3-6):**

a. Luke Coffee fully cooperated with authorities at every stage of this investigation.
   - Special Agent Michael Hillman contacted Luke Coffee on January 13, 2021 and Luke Coffee voluntarily returned Special Agent Hillman's call that same day and openly discussed the events of January 6, 2021.[12]
   - Special Agent Hillman stated that Luke Coffee, "did not appear to be trying to hide where he lived." [13]
   - Special Agent Hillman testified that over the next two weeks Luke Coffee voluntarily communicated with Special Agent Hillman "at least another dozen times" [14] before Luke Coffee's attorney contacted Hillman.

b. Jim Burnham spoke with Special Agent Hillman at least seven (7) times in February 2021:
   (1) February 2, 2021
   - Special Agent Hillman testified, that on February 2, 2021, he spoke to Jim Burnham and told him that he believed the offense was a Federal misdemeanor.[15]

   (2) February 3, 2021
   - Special Agent Hillman testified, that Jim Burnham spoke to him on February 3, 2021 and he told Jim Burnham that a charge decision had not been made.[16]

   (3) February 9, 2021
   - Special Agent Hillman testified, that Jim Burnham spoke to him on February 9, 2021 and that he told Jim Burnham that he had not seen any violent posts by Luke Coffee.[17]

   (4) February 24, 2021 approximately at 9:15 AM
   - Special Agent Hillman testified, that he spoke with Jim Burnham again on February 24, 2021 when he asked if Luke Coffee's number changed.[18]

   (5) February 24, 2021 at 12:30 PM

---

[12] Transcript of March 8, 2021 Detention Hearing, Page 52 Lines 4-12
[13] Transcript of March 8, 2021 Detention Hearing, Page 54. Lines 22-25 and Page 55 Lines 1-11
[14] Transcript of March 8, 2021 Detention Hearing, Page 64 Lines 19-23
[15] Transcript of March 8, 2021 Detention Hearing, Page 67 Line 5
[16] Transcript of March 8, 2021 Detention Hearing, Page 68 Lines 7-9
[17] Transcript of March 8, 2021 Detention Hearing, Page 68 Lines 17-23
[18] Transcript of March 8, 2021 Detention Hearing, Page 68 Lines 24-25 Page 69 Lines 1-6

- Special Agent Hillman testified, that he spoke with Jim Burnham on February 24, 2021 at 12:30 PM and Jim Burnham informed him that Luke Coffee's cell phone number had not changed.[19]

(6) February 24, 2021 @3:30 PM
- Special Agent Hillman testified, that he spoke with Jim Burnham on February 24, 2021 at 3:30 PM and that Jim Burnham notified him Luke Coffee's was moving to Tool, Texas, to stay with his parents.[20]

(7) February 24, 2021 @5:00 PM
- Special Agent Hillman testified, that he spoke with Jim Burnham on February 24, 2021 at 5:00 PM and that he told Jim Burnham that Luke Coffee needed to turn himself in the next day, Friday, February 25th at 9:00 AM at the Federal Court House.[21]

c. Pretrial Services recommended pre-trial release for Luke Coffee and established that he had many ties to the community.
- "…defendant stated he has daily contact with both of his parents who reside in Tool, Texas. The defendant reported bi-weekly contact with his brothers, Ben Coffee and Nate Coffee, who both reside in Dallas, Texas. The defendant related he has weekly contact with his sister, Helen Coffee, who resides in Marble Falls, Texas…The defendant's personal history and familial ties were verified by the defendant's mother, Marybeth Coffee, via telephone."[22]
- "To reasonably assure the defendant's appearance and the safety of the community, Pretrial Services respectfully recommends the defendant be released on a Personal Recognizance bond and with the following conditions…"[23] (The Pretrial Service report goes on to list 7 conditions none of which include GPS monitoring which is added by the Magistrate Judge.)
- For the last 13 years, Luke Coffee has been the owner of Coffee Productions Inc. based in Dallas, TX.[24]

d. Luke Coffee voluntarily turned himself in on February 25, 2021, at 9:00 am as scheduled.
- Special Agent Hillman testified, that Luke Coffee voluntarily gave him consent to search his vehicle.[25]
- Luke Coffee also voluntarily told Special Agent Hillman where his car keys and backpack were.

---

[19] Transcript of March 8, 2021 Detention Hearing, Page 69 Lines 7-14
[20] Transcript of March 8, 2021 Detention Hearing, Page 70 Lines 8-21
[21] Transcript of March 8, 2021 Detention Hearing, Page 71 Lines 8-13
[22] Pretrial Services Report of March 5, 2021, Page 2
[23] Pretrial Services Report of March 5, 2021, Page 5
[24] Pretrial Services Report of March 5, 2021, Page 3
[25] Transcript of March 8, 2021 Detention Hearing, Page 72 Lines 20-25 and Page 73 Lines 1-14

e. Special Agent Hillman did not consider Luke Coffee a flight risk on February 25, 2021, the day after he turned himself in.
   - At the detention hearing, Special Agent Hillman testified that the day after Luke Coffee turned himself in voluntarily, he told Luke Coffee's attorney over the phone on February 25, 2021, that Luke Coffee was not considered a flight risk "so far." [26]

f. Six (6) witnesses testified and nine (9) proffered witnesses that Luke Coffee poses no flight risk or threat to the community and any person:
   - Helen Coffee, sister of Luke Coffee.[27]
   - Herb Thomas, lifelong friend of Luke Coffee and owner of a Dallas Law Firm.[28]
   - Lindsey Collins, lifelong friend of Luke Coffee.[29]
   - Andrew Prine, friend of Luke Coffee for 22 years.[30]
   - Travis Barnes, friend of Luke Coffee for 24 years. [31]
   - Russell Coffee, Jr., father of Luke Coffee. [32]

g. Release to a third-party custodianship of is an extra assurance of compliance with release conditions and his father is an appropriate third-party custodian.

h. Electronic monitoring will further minimize Luke Coffee's already minimal flight risk. The Magistrate Judge in Dallas ordered that Luke Coffee "be subject to stand-alone monitoring" in the form of a "GPS system tracking to monitor and enforce his position."[33]

## IV.
## Conclusion

Such conditions as those ordered by the Magistrate Judge are more than sufficient to reasonably assure Luke Coffee's future appearances before this Court and the safety of all persons and the community under the heightened standards of the Bail Reform Act.

Respectfully submitted,

/s/ *Jim Burnham*

Jim Burnham

State Bar No. 0344100
6116 N. Central Expwy.,
Ste. 515

---

[26] Transcript of March 8, 2021 Detention Hearing, Page 73-74 Lines 24-25 and Lines 1-3
[27] Transcript of March 8, 2021 Detention Hearing, Page 108 Line 9
[28] Transcript of March 8, 2021 Detention Hearing, Page 121 Lines 23-25 and Page 122 Lines 1-3
[29] Transcript of March 8, 2021 Detention Hearing, Page 132 Lines 23-25 and Page 132 Lines 1-3
[30] Transcript of March 8, 2021 Detention Hearing, Page 135 Line 10-13
[31] Transcript of March 8, 2021 Detention Hearing, Page 141 Line 7-15
[32] Transcript of March 8, 2021 Detention Hearing, Page 143 Lines 1-10 and Lines 15-23
[33] Transcript of March 8, 2021 Detention Hearing, Page 174 Line 4

Dallas, Texas 75206
Telephone (214) 750-6616
Facsimile (214) 750-6649
Email:
Jim@Jburnhamlaw.com

## CERTIFICATE OF SERVICE

I, Jim Burnham, hereby certify that on April 7, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Peter Lallas
Assistant United States Attorney
N.Y. Bar Number 4290623
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 252-6879
Email: peter.lallas@usdoj.gov

/s/ Jim Burnham
**JIM BURNHAM**

§ 5103       TITLE 40—PUBLIC BUILDINGS, PROPERTY, AND WORKS       Page 124

2. All other real property acquired by the Architect of the Capitol under authority of the Additional House Office Building Act is hereby declared to be part of the United States Capitol Grounds and is hereby made subject to the Act of July 31, 1946 (40 U.S.C., secs. 193a to 193m, [207a,] 212a, (212a–2, 212a–3,] and 212b) [now 2 U.S.C. 1922, 1961, 1966, 1967, 1969; 40 U.S.C. 5101–5107, 5109], including any amendments to such Act.

3. Nothing herein shall be construed to contravene (a) the provisions of Public Law 89-260 authorizing the future use of Squares 732 north and south as a site for the Library of Congress James Madison Memorial Building; or (b) the authority delegated by the House Office Building Commission to the Select House Committee under authority of H. Res. 514, 90th Congress, pertaining to the direction and supervision of the use and operation of the four House Garages and outdoor parking lots.

4. This order shall become effective immediately.

HOUSE OFFICE BUILDING COMMISSION

JOHN W. MCCORMACK, *Chairman.*
EMANUEL CELLER, *Member.*
CHARLES E. GOODELL, *Member.*

### § 5103. Restrictions on public use of United States Capitol Grounds

Public travel in, and occupancy of, the United States Capitol Grounds is restricted to the roads, walks, and places prepared for that purpose.

(Pub. L. 107–217, Aug. 21, 2002, 116 Stat. 1176.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 5103 | 40:193b. | July 31, 1946, ch. 707, §2, 60 Stat. 718. |

The words "by flagging, paving, or otherwise" are omitted as unnecessary.

### § 5104. Unlawful activities

(a) DEFINITIONS.—In this section—

(1) ACT OF PHYSICAL VIOLENCE.—The term "act of physical violence" means any act involving—

(A) an assault or other infliction or threat of infliction of death or bodily harm on an individual; or

(B) damage to, or destruction of, real or personal property.

(2) DANGEROUS WEAPON.—The term "dangerous weapon" includes—

(A) all articles enumerated in section 14(a) of the Act of July 8, 1932 (ch. 465, 47 Stat. 654); and

(B) a device designed to expel or hurl a projectile capable of causing injury to individuals or property, a dagger, a dirk, a stiletto, and a knife having a blade over three inches in length.

(3) EXPLOSIVES.—The term "explosives" has the meaning given that term in section 841(d) of title 18.

(4) FIREARM.—The term "firearm" has the meaning given that term in section 921(3)[1] of title 18.

(b) OBSTRUCTION OF ROADS.—A person may not occupy the roads in the United States Capitol Grounds in a manner that obstructs or hinders their proper use, or use the roads in the area of the Grounds, south of Constitution Avenue and B Street and north of Independence Avenue and B Street, to convey goods or merchandise, except to or from the United States Capitol on Federal Government service.

(c) SALE OF ARTICLES, DISPLAY OF SIGNS, AND SOLICITATIONS.—A person may not carry out any of the following activities in the Grounds:

(1) offer or expose any article for sale.

(2) display a sign, placard, or other form of advertisement.

(3) solicit fares, alms, subscriptions, or contributions.

(d) INJURIES TO PROPERTY.—A person may not step or climb on, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf, in the Grounds.

(e) CAPITOL GROUNDS AND BUILDINGS SECURITY.—

(1) FIREARMS, DANGEROUS WEAPONS, EXPLOSIVES, OR INCENDIARY DEVICES.—An individual or group of individuals—

(A) except as authorized by regulations prescribed by the Capitol Police Board—

(i) may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device;

(ii) may not discharge a firearm or explosives, use a dangerous weapon, or ignite an incendiary device, on the Grounds or in any of the Capitol Buildings; or

(iii) may not transport on the Grounds or in any of the Capitol Buildings explosives or an incendiary device; or

(B) may not knowingly, with force and violence, enter or remain on the floor of either House of Congress.

(2) VIOLENT ENTRY AND DISORDERLY CONDUCT.—An individual or group of individuals may not willfully and knowingly—

(A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;

(B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;

(C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of—

(i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or

(ii) the Library of Congress;

(D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive

---

[1] So in original. Probably should be "921(a)(3)".



EXHIBIT A

654      72d CONGRESS.  SESS. I.  CHS. 465, 466.  JULY 8, 1932.

POSSESSION OF CERTAIN DANGEROUS WEAPONS

*Possession of certain dangerous weapons forbidden.*

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,*

*Provisos. Exceptions.*

That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

PENALTIES

*Punishment for violations.*

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

CONSTITUTIONALITY

*Invalidity of any provision not to affect remainder.*

SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

CERTAIN ACTS REPEALED

*Vol. 31, p. 1328, repealed.*

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

JOINT RESOLUTION

Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

*July 8, 1932.*
*[H. J. Res. 462.]*
*[Pub. Res., No. 35.]*

*World War veterans. Appropriation for, to provide transportation from District of Columbia to their homes. Post, p. 701.*

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000: *Provided,*

*Proviso. Credited as a loan.*

That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

Approved, July 8, 1932.

Case 1:21-cr-00327-RC Document 53 Filed 04/21/22 Page 14 of 15
Case 1:21-mj-00236-GMH Document 15-1 Filed 04/08/21 Page 1 of 2

§ 5103 TITLE 40—PUBLIC BUILDINGS, PROPERTY, AND WORKS Page 124

2. All other real property acquired by the Architect of the Capitol under authority of the Additional House Office Building Act is hereby declared to be part of the United States Capitol Grounds and is hereby made subject to the Act of July 31, 1946 (40 U.S.C. secs. 193a to 193m, [207a,] 212a, [212a-2, 212a-3,] and 212b) [now 2 U.S.C. 1922, 1961, 1966, 1967, 1969; 40 U.S.C. 5101–5107, 5109], including any amendments to such Act.

3. Nothing herein shall be construed to contravene (a) the provisions of Public Law 89-260 authorizing the future use of Squares 732 north and south as a site for the Library of Congress James Madison Memorial Building; or (b) the authority delegated by the House Office Building Commission to the Select House Committee under authority of H. Res. 514, 90th Congress, pertaining to the direction and supervision of the use and operation of the four House Garages and outdoor parking lots.

4. This order shall become effective immediately.

HOUSE OFFICE BUILDING COMMISSION

    JOHN W. MCCORMACK, *Chairman.*
    EMANUEL CELLER, *Member.*
    CHARLES E. GOODELL, *Member.*

### § 5103. Restrictions on public use of United States Capitol Grounds

Public travel in, and occupancy of, the United States Capitol Grounds is restricted to the roads, walks, and places prepared for that purpose.

(Pub. L. 107–217, Aug. 21, 2002, 116 Stat. 1176.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 5103 | 40:193b. | July 31, 1946, ch. 707, §2, 60 Stat. 718. |

The words "by flagging, paving, or otherwise" are omitted as unnecessary.

### § 5104. Unlawful activities

(a) DEFINITIONS.—In this section—

(1) ACT OF PHYSICAL VIOLENCE.—The term "act of physical violence" means any act involving—

(A) an assault or other infliction or threat of infliction of death or bodily harm on an individual; or

(B) damage to, or destruction of, real or personal property.

(2) DANGEROUS WEAPON.—The term "dangerous weapon" includes—

(A) all articles enumerated in section 14(a) of the Act of July 8, 1932 (ch. 465, 47 Stat. 654); and

(B) a device designed to expel or hurl a projectile capable of causing injury to individuals or property, a dagger, a dirk, a stiletto, and a knife having a blade over three inches in length.

(3) EXPLOSIVES.—The term "explosives" has the meaning given that term in section 841(d) of title 18.

(4) FIREARM.—The term "firearm" has the meaning given that term in section 921(3)[1] of title 18.

(b) OBSTRUCTION OF ROADS.—A person may not occupy the roads in the United States Capitol Grounds in a manner that obstructs or hinders their proper use, or use the roads in the area of the Grounds, south of Constitution Avenue and B Street and north of Independence Avenue and B Street, to convey goods or merchandise, except to or from the United States Capitol on Federal Government service.

(c) SALE OF ARTICLES, DISPLAY OF SIGNS, AND SOLICITATIONS.—A person may not carry out any of the following activities in the Grounds:

(1) offer or expose any article for sale.

(2) display a sign, placard, or other form of advertisement.

(3) solicit fares, alms, subscriptions, or contributions.

(d) INJURIES TO PROPERTY.—A person may not step or climb on, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf, in the Grounds.

(e) CAPITOL GROUNDS AND BUILDINGS SECURITY.—

(1) FIREARMS, DANGEROUS WEAPONS, EXPLOSIVES, OR INCENDIARY DEVICES.—An individual or group of individuals—

(A) except as authorized by regulations prescribed by the Capitol Police Board—

(i) may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device;

(ii) may not discharge a firearm or explosives, use a dangerous weapon, or ignite an incendiary device, on the Grounds or in any of the Capitol Buildings; or

(iii) may not transport on the Grounds or in any of the Capitol Buildings explosives or an incendiary device; or

(B) may not knowingly, with force and violence, enter or remain on the floor of either House of Congress.

(2) VIOLENT ENTRY AND DISORDERLY CONDUCT.—An individual or group of individuals may not willfully and knowingly—

(A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;

(B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;

(C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of—

(i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or

(ii) the Library of Congress;

(D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive

---

[1] So in original. Probably should be "921(a)(3)".



EXHIBIT A

654     72d CONGRESS. SESS. I. CHS. 465, 466. JULY 8, 1932.

## POSSESSION OF CERTAIN DANGEROUS WEAPONS

*Possession of certain dangerous weapons forbidden.*

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

*Proviso. Exceptions.*

### PENALTIES

*Punishment for violations.*

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

### CONSTITUTIONALITY

*Invalidity of any provision not to affect remainder.*

SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

### CERTAIN ACTS REPEALED

*Vol. 31, p. 1328, repealed.*

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

### JOINT RESOLUTION

*July 8, 1932.*
*[H. J. Res. 462.]*
*[Pub. Res. No. 35.]*

Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

*World War veterans. Appropriation for, to provide transportation from District of Columbia to their homes. Post, p. 701.*

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000: *Provided,* That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

*Proviso. Credited as a loan.*

Approved, July 8, 1932.