# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CAUSE NO. 1:21-CR-327-RC-1 |
| | § | |
| | § | |
| LUKE RUSSELL COFFEE | § | |

## MR. COFFEE'S MOTION FOR TRANSFER OF VENUE

Luke Russell Coffee, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 21(a), and the Fifth, Sixth, and Eighth Amendments to the United States Constitution, hereby respectfully requests that this Court move his trial outside the District of Columbia (D.C.). Venue data reveals an overwhelming presumption of guilt among prospective District of Columbia jurors and reveals that D.C. jurors are demonstrably more hostile towards January 6 defendants than adults surveyed nationwide and in a demographically comparable federal court division. Mr. Coffee would propose the Court transfer any jury trial to the Northern District of Texas. The recent public prime-time hearings by the Select Committee to Investigate the January 6th Attack have further inflamed the possible jurors against the January 6th defendants and Mr. Coffee specifically. In light of this data as well as the size and the characteristics of the D.C. jury pool, and the impact that sustained and inflammatory media coverage has had on the D.C. jury pool, transfer out of this district is the only way to protect Mr. Coffee's constitutional rights to due process and a fair trial.

# ARGUMENT

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. (2010). The importance of an impartial jury is so fundamental to Due Process that, notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must* transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias). As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide trial and appellate courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.[1] *Skilling*, 561 U.S. at 378.

Where it attaches, the Supreme Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during *voir dire*

---

[1] Though not relevant to the instant motion, the Supreme Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt. 561 U.S. at 383.

because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Florida.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, *voir dire* is simply not a cure for significant and substantiated Due Process concerns about the jury pool.

Mr. Coffee respectfully submits that each of those concerns is pressing in this case.

## I.    The survey data, size, and characteristics of the District of Columbia Jury pool demonstrate that the presumption of juror prejudice attaches.

The foundation for the presumption of prejudice is found in *Rideau*. 373 U.S. at 727. In *Rideau*, the first factor that the Court weighed in favor of a finding of prejudice was that about half of the small jury pool had been exposed to prejudicial media—a widely-circulated video of the defendant's confession. *See id*. Despite *voir dire* revealing that only three jurors had actually seen the broadcasts at issue, the

Court found that the share of the pool that the video tainted was significant enough to render the defendant presumptively prejudiced. *See id*. In applying *Rideau*, many courts have focused on population size and diversity as a proxy for the population's share that was likely impacted. For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal; because Houston is the fourth-largest city in the United States and highly diverse, a significant number of prospective jurors would lack any connection to Enron. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated."). Three elements of Mr. Coffee's case distinguish it from *Skilling*, 1) the size and demographics of D.C., 2) the events of January 6 occurring in the heart of the city and rippling throughout the entire city for months following January 6, 2021, and 3) the steady drumbeat of pre-trial publicity. Therefore, Mr. Coffee's case more tracks the presumptively prejudicial circumstances in *Rideau*. Indeed, survey data confirms the commonsense conclusion that Mr. Coffee will not be able to assemble a fair and impartial jury as the Constitution requires.

i.    **Survey data supports that prejudice has attached.**

On behalf of all indigent clients charged in the wake of January 6, the Federal Public Defender for the District of Columbia retained the services of the professionals of Select Litigation to survey the District of Columbia jury pool. As explained in Exhibit 1, Select Litigation polled 400 potential District of Columbia jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia. The firm also retained the services of a media research firm, News Exposure, to analyze

aspects of news coverage concerning January 6. *See* Ex. 1, with appendices.

**a.    Significant majorities of potential jurors in DC have prejudged the January 6 defendants.**

Select Litigation's survey of District of Columbia potential jurors shows that significant majorities of these potential jurors have unfavorable impressions of January 6 defendants, have already concluded they are guilty, and have already concluded they had the specific intent to obstruct.

Exhibit 1 summarizes Select Litigation's findings, but highlights include that District of Columbia residents overwhelmingly:

- have unfavorable opinions of those arrested for participating in the January 6 demonstrations (84%); and

- would characterize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, 54% respectively).

Ex. 1 ¶¶ 9, 14. These results indicate that most of the jurors will be predisposed against these defendants, will likely view them as guilty of conduct other than that with which they are charged, and will likely consider them as posing a danger to the community broadly, notwithstanding the strength or weakness of the evidence that they committed the crimes charged.

Significant majorities also:

- would characterize these individuals as "criminals" (62%); and
- have already formed the opinion that these individuals are people "guilty" of the charges brought against them (71%).

Ex. 1 ¶¶ 14, 10.

One would expect most respondents to report that they could not predict how they would judge a trial before it had begun, given social expectations arising from jurors' well-known civic duty in criminal cases not to determine guilt before hearing all of the evidence. But over half of DC survey respondents are willing to *admit* that they are more likely to vote "guilty" if they find themselves on a jury in one of these cases (52%). Ex. 1 ¶ 11. The only thing that renders this unsurprising are the other results reported above – reflecting deep prejudice against the January 6 defendants.

These trends likely also explain the fact that <u>a third of DC survey respondents</u> – who know themselves and their fellow citizens well – would not trust a jury here to give them a fair trial if they themselves were accused of violating the law on January 6th. *See* Ex. 1 ¶ 8 (reporting that only 67% of potential DC jurors stated that they believe that they personally would receive a fair trial if they were defendants in a January 6 case).

Further, the assessment of those respondents who claim that they believe the January 6 defendants *can* get a fair trial is suspect. Of those who profess to believe that January 6 defendants can get a fair trial in this city, 76% have already decided that these defendants are guilty. *Id.* ¶ 12. Further, 56% of this group confess that they would be more likely to vote "guilty" if they were on a jury. *Id.*

Perhaps most striking of all, Select Litigation's survey data shows that an overwhelming percentage of DC residents have already made up their minds about an essential element for several counts in the Superseding Indictment. To prove that Mr. Judd "corruptly" obstructed an official proceeding under 18 U.S.C. § 1512 (c)(2) as charged, the government must at least prove that a defendant acted with the specific intent to obstruct a Congressional proceeding (the counting of electoral votes, in the government's theory).

Unfortunately, the survey data reveals that overwhelming majorities of potential DC jurors have already reached the conclusion that at least those who entered the Capitol on January 6 were acting with precisely that intent. They have concluded that these defendants were:

- trying to overturn the election and keep Donald Trump in power (85%);

- insurrectionists (76%); and/or

- trying to overthrow the United States government (72%).

Ex. 1 ¶ 15, 18.

Thus, not only have most DC residents reached the broader conclusion that these individuals are "guilty," but the vast majority have prejudged an element essential to several charges in the case.

This is just the sort of pernicious bias that a typical *voir dire* would not reveal, as *voir dire* usually does not entail inquiring into jurors' ideas about each and every element of charged offenses. And asking jurors to state whether they have reached conclusions that they cannot set aside during the trial will not reveal such

prejudgment: jurors do not always understand which of their opinions are relevant, and what they cannot take for granted without proof beyond a reasonable doubt. *See Smith v. Phillips*, 455 U.S. 209, 221-22 (1982)) (O'Conner, J. concurring) ("Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it").

That is apparently the case here: many of the people who expressed confidence that January 6 defendants can obtain a fair trial have unwittingly already prejudged an essential element in the case. That is, 78% of those in the survey who say that they believe the defendants will receive a fair trial also take it as a given that defendants who entered the building were trying to overthrow the government and/or to keep Donald Trump in power. Ex. 1 ¶ 16. And 82% of those who believe defendants can receive a fair trial also believe the term "insurrection" is an apt description for their actions. *Id.*[2]

---

[2] Indeed, according to Select Litigation, some of the relative few DC survey respondents who indicated that they are reserving judgment about whether they "think the people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them," or are "more likely to vote that the person is guilty or not guilty of those charges," (*i.e.*, those answering "it depends" or "don't know," or refusing to answer Q4 or Q5) may also nevertheless have unwittingly have prejudged an essential element in the case. That is, notwithstanding their cautious answers to Q4 or Q5, many of these respondents indicated that they believe those who went into the Capitol were there to overturn the vote, participate in an insurrection, and/or overthrow the government (Q11). This was not reported in Select Litigation's report at Exhibit 1 because the sample size for these groups is too small to be statistically meaningful.

Even if this survey answer led the Court to itself *voir dire* potential jurors and to allow attorney-conducted *voir dire* about this issue (which it should, at a minimum), unless the *voir dire* probes every controversial element of each charged offense (such as whether any conduct directed at law enforcement could possibly have been justified by police misconduct), these results show that *voir dire* cannot be expected to preserve Mr. Coffee's right to an impartial jury in this District.

b.  **Survey results from the Northern District of Georgia are powerful evidence that District of Columbia residents are particularly unlikely to be impartial.**

Select Litigation's study also reinforces that this District is perhaps uniquely unlikely to produce an impartial jury. There is perhaps no other place like the District of Columbia. It is one of the least populous federal court divisions. A significant share of its population is employed by the federal government. A very high proportion of its residents have an associate degree or higher. Ex. 1 ¶ 21. And the ratio of Biden to Trump supporters in 2020 was more lopsided than in any other federal judicial divisions. *Id.* ¶ 22. These unique attributes would lead to a commonsense conclusion that the January 6 defendants would not be able to assemble an impartial jury. Now, Select Litigation's data confirms this. Select Litigation surveyed 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, which is similar demographically to the District of Columbia. Ex. 1 ¶ 19-23. The results show that significantly fewer potential jurors there have set their minds against January 6 defendants. For example:

- 84% of DC survey respondents view people arrested in the wake of January 6th unfavorably, but only 54% of Atlanta division respondents do;

- 71% of DC respondents are of the opinion that these individuals are guilty, but only 54% of Atlanta division respondents share this opinion;

- More than half of DC respondents say they are more likely to vote "guilty" if on a jury, but fewer than half of Atlanta division respondents say this;

- 62% of DC respondents would characterize the January 6 defendants as "criminals," and well over 50% would characterize them as "white supremacists" and "members of a violent right-wing organization," whereas fewer than half of Atlanta division respondents would characterize the January 6 defendants in these three ways (48%, 40%, and 39%, respectively).

Ex. 1 ¶¶ 23, 24.

Finally, the evidence suggests that jurors in other districts are more likely to be like the Atlantans than like DC residents. Select Litigation asked both sets of survey respondents to state whether they associated those who entered the Capitol on January 6 with certain purposes, a question that had also been asked in a recent national poll recently conducted by CBS/YouGov. Ex. 1 ¶¶ 3, 18, 25.[3] The results show

---

[3] The results of the poll are reviewed at
https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view (last visited 4/5/22). As noted in Select Litigation's Report, the firm mirrored the wording of the CBS/YouGov poll as closely as possible to maximize the comparative value, even though Select Litigation would have used different wording. Further, differences in methodology mean the comparison is not perfect. *See* Ex. 1 ¶ 18.

that potential jurors in *Atlanta* hold prejudicial views on this issue at similar rates as survey respondents do *nationally*. *Id.* ¶ 25. But a far greater share of potential jurors in the District of Columbia hold prejudicial views on this issue.

| Comparison of Beliefs among Jury-eligible Citizens in DC & Atlanta Division, & adults nationwide | | | | |
|---|---|---|---|---|
| | | USA | DC | GA |
| Trying to overturn the election and keep Donald Trump in Power | Would | 63% | 84% | 68% |
| | Would not | 37 | 9 | 19 |
| Insurrection | Would | 55% | 76% | 55% |
| | Would not | 45 | 13 | 27 |
| Trying to overthrow the US government | Would | 54% | 72% | 57% |
| | Would not | 46 | 20 | 33 |
| A protest that went too far | Would | 76% | 69% | 70% |
| | Would not | 24 | 24 | 21 |
| Patriotism | Would | 26% | 13% | 25% |
| | Would not | 74 | 81 | 63 |
| Defending freedom | Would | 28% | 10% | 21% |
| | Would not | 72 | 86 | 70 |

*Id.* ¶ 25. In short, the evidence suggests that it is *this district* that is the national outlier in terms of juror prejudice, not Atlanta.

### ii. *Size and makeup of the D.C juror pool makes it impossible for prejudice not to attach.*

Add to the overall views of potential D.C. juror pool that the District of Columbia is one of the most compact major U.S. cities and the smallest federal district in the nation, and counsel respectfully submits that it is impossible for prejudice not to attach. Moreover, as the Court is aware, a huge proportion of District of Columbia residents either work for the federal government themselves or have friends or family

who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater DC area (excluding postal workers, federal bureau of investigation workers, and staff on several federal commissions).[4] Nearly 200,000 of those workers and annuitants are within the district itself. *Id.* With a total population of around 690,000, it seems clear that any given member of the district jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the DC Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in DC itself.[5] And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy.

In particular, nearly 15,000 individuals work for Congress directly, and many more residents have friends and family who do.[6] Another large share are in, or have friends and family in, the many law enforcement groups who took part in responding to January 6.[7] This means that an enormous share of District of Columbia residents

---

[4] *Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.
[5] *Trends in Federal Employment in DC,* DC Policy Center (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.
[6] *Vital Statistics on Congress*, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.
[7] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021- 2025*, U.S. Capitol Police (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP

have significant and unique connections with individuals or institutions that were affected by January 6. Such connections are not likely to be present in any other comparable district. Because the government and much of the media have characterized the events of January 6 – including the attempted obstruction in which the government alleges Mr. Coffee participated – as an attack on our elections, government institutions generally, and democracy as a whole, this suggests that those District residents closely connected to the government are more likely to view themselves as the direct victims of the events.

Moreover, even District residents that have no direct connection to the government reported feeling deeply traumatized by the events that took place so close to where they live and work. For example, one DC resident shared in an interview that:

---

%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. *See Metropolitan Police Force Annual Report 2020*, DC.gov (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR202 0_lowres_a.pdf; *see also About Us*, DC National Guard (2020), https://dc.ng.mil/About-Us/. More than 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer- injuries.html. And while not all individuals employed by these agencies reported to the Capitol on January 6, all 9,350 individuals *were* directly and adversely affected by the January 6 events in the form of increased presence and overtime demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021), https://thehill.com/policy/national-security/561832-more- than-75-capitol-police-officers-have-quit-amid-low-morale-since.

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence.[8]

Such accounts are typical of those gathered in interviews in the days following January 6, during which the D.C. Mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration.[9] District neighborhoods became occupied by the Metropolitan Police and over 25,000 military personnel in the weeks that followed.[10] Indeed, a local subsidiary of the national public broadcasting network, *DCist*, reported that:

> Residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. […]

---

[8] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happens-thursday-edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-atrocities-at-u-s-capitol-1.5864894.

[9] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues- mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021) (noting the many street closures),https://www.washingtonian.com/2021/01/11/dc-mayor-says-americans- should-not-come-to-washington-for-the-inauguration/.

[10] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan. 15, 2021),https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.

Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.[11]

As the Court is no doubt aware, the effects of these events continue to be felt in DC well beyond January 6, 2021. Indeed, DC residents reacted with fear in anticipation of protests planned for September of 2021 that were intended to show support for individuals detained in connection with prosecutions arising from the events of January 6. For example, the *New York Times* ran a piece titled "Washington, D.C. On Edge Over January 6 Protests,"[12] and the Associated Press similarly reported "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing DC's overall tenor and response to these ongoing demonstrations.[13]

Further, an overwhelming number of District of Columbia residents — over 92 percent — voted for President Biden.[14] According to the government's theory of the case, Mr. Coffee and the others charged in connection with January 6 did what they did in order to prevent Joseph Biden from becoming President notwithstanding his share of the electoral and popular vote.[15] That is, the government's theory is that Mr.

---

[11] Jenny Gathright and Rachel Kurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, DCist (Jan. 13, 2021), https://dcist.com/story/21/01/13/dc-state-of- emergency-residents/.

[12] Jonathan Weisman and Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. Times (Sept. 18, 2021),
https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html.

[13] Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021),https://www.usnews.com/news/politics/articles/2021-09- 18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters.

[14] *General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

[15] *See, e.g.*, Gov't Mem., ECF No. 19 at 13 (characterizing the events as an attempt to occupy the Capitol in order to prevent the certification of the Electoral College results).

Coffee and others were seeking to nullify the votes of an overwhelming majority of District residents[16] – in the *only* federal election in which District residents have any say, given their lack of representation in Congress. *See, e.g.*, *Castañon v. United States*, 444 F. Supp. 3d 118, 139 (D.D.C. 2020) ("Article I contemplates that only 'residents of actual states' have and may exercise the House franchise") (citing *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000)), *reconsideration denied*, No. CV 18-2545, 2020 WL 5569943 (D.D.C. Sept. 16, 2020), *aff'd*, No. 20-1279, 2021 WL 4507556 (U.S. Oct. 4, 2021).

Finally, the government, the media, and even judges in this division speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat of January 6 can only take place in their home.[17] As such, the residents of the district sitting as jurors are highly likely to view Mr. Coffee not only as someone who victimized them, but also as someone who might victimize them again in the future, raising a concern about punishing for propensity. Given the electoral makeup of the district, it would be impossible to empanel a jury that was not full of people that the government charges were the targets of Mr. Coffee's

---

[16] *See id.*

[17] *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump- documentary-what-matters/index.html; *see also* Jordan Fischer et. al, *Judge Skewers DOJ At January 6 Sentencing*, WUSA9 (Oct. 28, 2021) (explaining that the sentence was **designed to alert** "others who might consider attacking the Capitol to know their punishment would 'hurt.'"), https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of- the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl- howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae.

alleged offenses. *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (the population of the greater metro area, including Virginia and Maryland, was large enough to not support an inference of prejudice by media reporting).

The survey results, size, and characteristics of the District of Columbia jury pool make crystal clear that prejudice has attached, and that Mr. Judd cannot obtain a fair and impartial trial here.

### iii. Media coverage in the district is another reason prejudice has attached.

Although many defendants request a transfer of venue citing pretrial publicity, the Sixth Amendment is concerned with whether jurors' conclusions will be induced by "*any* outside influence" rather than "only by evidence and argument in open court[.]" *Skilling*, 571 U.S. at 278 (quoting *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.)) (emphasis added). That outside influence can be public print *or* "private talk." *Id.* (quoting *Patterson*, 205 U.S. at 462). It can be "the sheer number of victims." *See id* at 437-38 (Sotomayor, J., concurring in part and dissenting in part) (quoting with approval the Fifth Circuit's statement that the district court overseeing Skilling's trial "seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims"); *id.* at 437 (quoting with approval the Fifth Circuit's statement that district court lost sight of the proposition that "[t]he evaluation of the volume and nature of reporting is merely a proxy for the real inquiry: whether there could be a fair trial by an impartial jury that was not influenced by outside, irrelevant sources"). Or the improper outside influence may be

the *nature* of the media to which jurors have been exposed, or its prevalence close to the time to trial, or its tendency to provoke identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome." *Skilling*, 561 U.S. at 372 (discussing broadcast of confession in small town in *Rideau v. Louisiana*, 373 U.S. 723 (1963)); *United States v. McVeigh*, 918 F. Supp. 1467, 1473 (W.D. Okla. 1996) (emphasis added). The outside influence may also be "such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience." *McVeigh*, 918 F. Supp. at 1473.

In addition to the characteristics of the district's population, the direct effect of January 6 on them, and the government's theory of the case which all likely prejudice DC jurors against January 6 defendants, survey data suggests that media coverage may be another outside influence to the bias reflected in the survey results reported above.

Like the pretrial publicity in *Rideau* that led the Supreme Court to rule that the district court should have transferred the case to a new venue, the pretrial publicity about January 6 cases has been unforgettable, it has "invited prejudgment of . . . culpability," and it has been of the "smoking gun variety." *Skilling*, 561 U.S. at 383.[18] In *Rideau,* the Court concluded that no *voir dire* could cleanse the taint of a

---

[18] In *Skilling v. United States*, although the Court established no bright line rules about when media can contribute to a constitutional need to transfer venue, Justice Ginsberg noted that, when the Court has ruled that a case should have been transferred to a new venue in order to preserve defendants' constitutional right to trial by an impartial jury, it has emphasized (1) "the size and characteristics of" the

video of the defendant's uncounseled interrogation and "confession," which had been broadcast in a small town several times before trial. *Rideau*, 373 U.S. at 727. Here, potential jurors have been exposed to hours and hours of videos of the events of January 6, and hundreds of pictures of those events. Even digital newspapers include video footage embedded in articles.

Whereas the single recording at issue in *Rideau* captured a "dramatically staged confession of guilt," the hundreds of January 6 videos and photos circulated over the last 15 months capture the scene of the alleged January 6 crimes, and many of the alleged crimes themselves, including potential crimes committed by many other people who could be confused with Mr. Judd. *Skilling*, 561 U.S. at 382-83. Vivid images splashed across DC papers and television for the last fifteen months show people scaling the Capitol walls, hoisting a hangman's gallows and noose, waving Confederate flags, putting their feet on the desks in the Capitol, rifling through papers on desks in the Capitol, milling about and hanging from the balconies in the Senate Chamber, and appearing to try to break into the House chamber, among hundreds of other scenes.[19] Many of the images – and the general impression that

---

district with venue, (2) the extent to which news stories about the defendant contained confessions "or other blatantly prejudicial information of the type readers or viewers" in that venue "could not reasonably be expected to shut from sight," and
(3) the time that has passed between periods of significant publicity and the trial (if any has). *Skilling,* 561 U.S. at 382-83; *id.* at 381 ("[P]resumption of prejudice . . . attends only the extreme case.").

[19] *See, e.g.* Staff, "No pictures, no pictures': The enduring images from Jan. 6," *The Washington Post* (Jan. 4, 2022), at https://www.washingtonpost.com/nation/interactive/2022/photos-jan-6-capitol/ (last visited 2/3/22); "Chilling images from the Capitol riot: Jan. 6 insurrection in photos," *USA Today* (Jan 5. 2022), at https://www.usatoday.com/picture-gallery/news/politics/2022/01/03/jan-6-nsurrection-photos-

arises from viewing many of them – are "likely imprinted indelibly in the mind of anyone who [viewed them]," just like the recorded interrogation in *Rideau* would have been. *See Skilling*, 561 at 382-83. Much of this evidence has nothing to do with Mr. Judd, but because DC jurors have been inundated with these videos, they cannot be expected to know that, or to "shut [them] from sight" during trial. *See Skilling*, 561 U.S. at 382.

As such, the pretrial publicity about January 6 has been "blatantly prejudicial," and distinguishable from the type of press coverage that failed to convince the majority of the Supreme Court that prejudice should be presumed in Skilling. *Skilling*, 561 U.S. at 382-83 (distinguishing publicity in that case from the publicity in *Rideau* because it contained "[n]o evidence of the smoking-gun variety" and was not so shocking that it could not be shut from jurors' minds during trial).

Moreover, data gathered by News Exposure at the direction of Select Litigation establishes that coverage of January 6 has been extensive and persistent, particularly in the District of Columbia. *In just one year*, District of Columbia newspapers have *already* published at least 500 articles about January 6, and local news syndicates have broadcast over 7000 stories about the day. Ex. 1 at App. B-7 (print data); App. B-1 (broadcast data).[20] This coverage is far more extensive than the coverage of the

---

capitol-riot/9052798002/ last visited 2/3/22); D. Bennett, et al., "41 minutes of fear: A video timeline from inside the Capitol siege," *The Washington Post* (Jan. 16, 2021), at https://www.washingtonpost.com/investigations/2021/01/16/video-timeline-capitol - siege/ (last visited 2/3/22).

[20] These estimates may understate coverage of January 6, as News Exposure only counted hits containing a short list of terms: "January 6 riot" or "Capitol insurrection" or "Capitol riot" or "2021 US Capitol attack" or "Capitol violence." The Washington,

defendant that failed to persuade the Supreme Court that it should presume prejudice in *Skilling. See Skilling*, U.S. at 428-30 (Sotomayor, J., concurring in part and dissenting in part) (noting that it took multiple years between Enron's collapse and trial for there to accumulate hundreds of *Houston Chronicle* articles, and 1,600 local broadcast stories about Skilling).

Select Litigation also asked News Exposure to analyze coverage of January 6 in the Atlanta division of the Northern District of Georgia, which is similar demographically to the District of Columbia. Ex. 1 ¶¶ 27-32. Comparison of coverage in this District to coverage in Atlanta reinforces how persistent coverage has been in the District of Columbia. For example, in the month where January 6 was covered least by local D.C. broadcast affiliates (August of 2021), January 6 was still mentioned more than it had been in Atlanta in nine of the 12 months evaluated. Ex. 1 ¶ 30; *id.* at App. B-1, B2. The data also shows that District of Columbia print, broadcast, and web coverage of January 6 has exceeded Atlanta's equivalent's almost every month and has far surpassed Atlanta's coverage over the last year as a whole. Ex. 1, App. B. Indeed, for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in *The Washington Post.* Ex. 1 ¶ 28. In short, the data shows that District residents have been exposed to an enormous amount of coverage of January 6, and more local coverage of January 6 than residents of a comparable district have, thereby reinforcing the point that

---

DC newspapers News Exposure considered were *The Washington Post, The Washington Times*, and *Washington Examiner*.

January 6 is a local story in addition to being a national story, and Mr. Coffee will have an more difficult time seating an impartial jury in this district than in others.

## II.  Transferring this case out of the District is the only way to safeguard Mr. Coffee's constitutional right to an impartial jury.

The concept of presumption of prejudice is predicated on the idea that the institution of the jury is occasionally fallible. Of course, jurors are almost always trusted to represent their views wholly and accurately during *voir dire*, and to follow the court's instructions if selected for the jury. But the Supreme Court has recognized that a failsafe may be needed under a narrow set of conditions that make it more difficult for a juror to accurately assess their own bias, or to ignore salient community attitudes about the case. *See Rideau*, 373 U.S. at 726-27 (concluding that no review of "the *voir dire* examination of the members of the jury" was necessary to determine in that case that "that due process of law. . . required a [transfer]"); *see also, e.g.*, *Murphy*, 421 U.S. at 802 ("Even these indicia of impartiality [during *voir dire*] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows [during *voir dire*] is often its father.").

Commonsense suggested that the circumstances of January 6, the small size of this district, its many federal employees, the aftermath of January 6, the political makeup of DC coupled with the government's theory of the case, and the persistent news coverage of the events in this news- and politics-obsessed city make this venue

uniquely unlikely to produce an impartial jury as the Constitution demands. Data now confirms that there are extremely high levels of prejudice among potential jurors in this district, whether due to the influence of the factors above, particularly high levels of pretrial publicity, or all of the above. To a remarkable and standout degree, most potential jurors here have already made up their minds that the January 6 defendants are criminals, that they are guilty generally, and that they are guilty specifically of seeking to stop the counting of the electoral votes. Potential jurors know that their friends and family have made up their minds as well. Many do not even realize that they have already prejudged essential elements of the government's case. As a result, even those striving to be honest during *voir dire,* and striving to meet their obligations as jurors, would nevertheless remain partial in ways that *voir dire* could not reveal.

Under these extreme circumstances, prejudice must be presumed, and the Court should transfer this case to another venue to preserve Mr. Coffee's rights under to the Constitution, or at least pursuant to the Court's discretion under Rule 21 of the Rules of Criminal Procedure. *See Skilling*, 561 U.S. at 446 n.9 (Sotomayor, J., concurring in part and dissenting in part) (noting that district courts have wide discretion to transfer a case to another venue even if trial in the originating venue would not violate the Constitution, and that it would not have been imprudent to transfer the Skilling case given "the widely felt sense of victimhood among Houstonians and the community's deep-seated animus toward Skilling" even if these issues did not preclude a constitutional trial).

Finally, Mr. Coffee is now scheduled for trial in late February 2023. By that time, other January 6 defendants will have gone to trial. As of this filing, many January 6 defendant have already been convicted on all counts by DC juries. The already-small pool of even potentially eligible jurors will shrink, and pretrial publicity will likely experience other spikes. As such, the list of reasons for the Court to presume prejudice will only grow in the time between now and Mr. Coffee's trial. To ensure that Mr. Coffee's trial proceeds as scheduled, and that he is tried by an impartial jury, the Court should transfer this case to another suitable venue as soon as possible.

## <u>CONCLUSION</u>

Because each of the *Skilling* factors weighs in favor of finding a presumption of prejudice, Mr. Coffee respectfully requests that the Court transfer the case to the Northern District of Texas.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

/s/ ANTHONY J. COLTON
Supervisory Assistant Federal Public Defender
Western District of Texas
200 E. Wall Street, Suite 110
Midland, Texas 79701
(830) 308-6040
(432) 684-3814 (FAX)
Bar Number: Texas 24064564

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2022, I electronically filed the foregoing Defendant's Motion to Transfer Venue with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Melanie Alsworth
Assistant U.S. Attorney
Washington, D.C.

/s/ ANTHONY J. COLTON

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CAUSE NO. 1:21-CR-327-RC-1 |
| | § | |
| | § | |
| LUKE RUSSELL COFFEE | § | |

## ORDER

On this date came on to be considered the Defendant's Motion to Transfer Venue, and the Court having considered the premises, is of the opinion that the same should be and is hereby **GRANTED**.

It is therefore **ORDERED** that the Case be transferred to the Northern District of Texas for all further proceedings.

**SO ORDERED** on this the_____day of_____, 2022.

_____
HONORABLE RUDOLPH CONTRERAS
United States District Judge