**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 21-0327 (RC) |
| | : | |
| | : | |
| LUKE RUSSELL COFFEE, | : | Re Document No.: 62 |
| | : | |
| Defendant. | : | |
| | : | |

<u>**MEMORANDUM OPINION**</u>

**DENYING DEFENDANT'S MOTION TO TRANSFER VENUE**

**I. INTRODUCTION**

Defendant Luke Russell Coffee is charged with ten counts arising out of his alleged

participation in the riot at the Capitol on January 6, 2021.  Specifically, the Government charged

Defendant by indictment with: one count of civil disorder in violation of 18 U.S.C. § 231(a)(3);

two counts of assaulting, resisting, or impeding officers using a dangerous weapon in violation of

18 U.S.C. §§ 111(a)(1), (b); one count of entering and remaining in a restricted building or

grounds with a deadly or dangerous weapon in violation of 18 U.S.C. § 1752(a)(1); one count of

disorderly conduct in a restricted building or grounds with a deadly or dangerous weapon in

violation of 18 U.S.C. §§ 1752(a)(2), (b)(1)(A); one count of impeding ingress and egress in a

restricted building or grounds with a deadly or dangerous weapon in violation of 18 U.S.C.

§§ 1752(a)(3), (b)(1)(A); one count of engaging in physical violence in a restricted building with

a deadly or dangerous weapon in violation of 18 U.S.C. §§ 1752(a)(4), (b)(1)(A); one count of

disorderly conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D); one count of

impeding passage through the Capitol building or grounds in violation of 40 U.S.C.

§ 5104(e)(2)(E); and one count of committing act of physical violence in the Capitol building or grounds in violation of 40 U.S.C. § 5104(e)(2)(F). *See* Superseding Indictment, ECF No. 44. Defendant has filed a motion to transfer venue, *see* Def.'s Mot. Transfer Venue ("Def.'s Mot. Transfer"), ECF No. 62, and the motion is ripe for consideration. For the reasons stated below, the Court denies Defendant's motion to transfer venue.

## II. FACTUAL BACKGROUND

At approximately 1:00 p.m. on January 6, 2021, Congress convened to count the votes of the Electoral College and certify the results of the 2020 presidential election. Statement of Facts at 1, ECF No. 1-1. Vice President Mike Pence was present to preside over the session in his role as President of the Senate. *Id.* About an hour later, at approximately 2:00 p.m., the crowd that had gathered outside the Capitol building began to force its way inside. *Id.* at 2. The Government alleges that Defendant, who resides in Dallas, Texas, was among that crowd. *Id.* at 3, 5. Specifically, the Government alleges that Defendant was on the steps of the Capitol Building between 4:00 p.m. and 4:30 p.m. *Id.* at 7. Defendant was allegedly wearing "a brown cowboy style hat, a camouflage jacket, a blue bandana, and grey backpack." *Id.* at 5. The Government alleges that between 4:15 p.m. and 4:25 p.m. Defendant made his way up the steps of the Lower Terrace. *Id.* at 7–8. Defendant was allegedly present in the Lower Terrace area when Metro Police Department (MPD) and United States Capitol Police (USCP) officers were assaulted by protesters. *Id.* at 8. Defendant allegedly made physical contact with MPD and USCP officers at approximately 4:27 p.m. *Id.* at 9. About a minute later—at 4:28 p.m.— Defendant allegedly retrieved a crutch and pushed the crutch into the line of officers. *Id.* at 10– 12. When the officers attempted to force Defendant back, Defendant allegedly charged at the officers with the crutch. *Id.* at 15–16. At approximately 4:29 p.m., Defendant allegedly exited

the Lower Terrace area with the assistance of another rioter without engaging additional officers. *Id.* at 19.

## III. ANALYSIS

Criminal defendants have a constitutional right to trial by "an impartial jury of the State and district wherein the crime [was allegedly] committed."  U.S. CONST. amend. VI; *see also* U.S. CONST. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed.").  The Federal Rules of Criminal Procedure reflect the requirement to "prosecute an offense in a district where the offense was committed," Fed. R. Crim. P. 18, but also permit defendants to move to transfer venue either due to local prejudice or for convenience, Fed. R. Crim P. 21(a)–(b).  Where a defendant moves to transfer venue due to local prejudice, the "court must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against defendant exists in the transferring district that defendant cannot obtain a fair and impartial trial there."  *Id.* at 21(a).

The Supreme Court has recognized the principle that transfer of venue is a "basic requirement of due process" where "extraordinary local prejudice will prevent a fair trial," but emphasized that a pre-voir dire "presumption of prejudice . . . attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 378, 381 (2010) (internal citation omitted).  Because "juror *impartiality* . . . does not require *ignorance*," even "pervasive, adverse publicity" does not necessarily compel a presumption of prejudice, unless the press coverage is so intense as to "utterly corrupt[]" the trial.  *Id.* at 380–81, 384 (emphasis in original).  Accordingly, the "default practice of this jurisdiction [is] to conduct voir dire in order to determine whether a fair and impartial jury can be seated."  *United States v. Eicher*, No. 22-cr-0038, 2022 WL 11737926, at *3 (D.D.C. Oct. 20, 2022) (citing *United States v. Haldeman*, 559 F.2d 31, 41 (D.C. Cir. 1976)).

"'[A]dequate *voir dire* to identify unqualified jurors' is the primary safeguard against jury prejudice." *United States v. Ballenger*, No. 21-cr-0719, 2022 WL 16533872, at *1 (D.D.C. Oct. 28, 2022) (quoting *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)).

In *Skilling*, the Supreme Court identified three main factors to guide the inquiry into whether prejudice should be presumed before voir dire:  (1) the "size and characteristics of the community in which the crime occurred"; (2) whether press coverage of the crime "contain[s] [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; and (3) the time that elapsed between the crime and the trial.  561 U.S. at 382–83.  Courts in this district have considered a large number of motions to transfer venue similar to that submitted by Defendant in this case.  In each case, the court has denied the motion after evaluating the *Skilling* factors, finding that the defendant failed to establish extraordinary local prejudice that would prevent a fair trial.  *See, e.g.*, *Eicher*, 2022 WL 11737926, at *1 (denying motion to transfer by defendant charged in connection with January 6, 2021 "[l]ike every other court of this jurisdiction to consider the same argument"); *see also* Gov't's Opp'n to Mot. Transfer Venue ("Gov't's Transfer Opp'n") at 1 n.1, ECF No. 64 (explaining that "[e]very judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion" and listing cases).  After thorough review of Defendant's motion and the Government's opposition, the Court is convinced that the same result should obtain here.

### A.  Size and Characteristics of the Community

Defendant argues that the District of Columbia's size and characteristics weigh in favor of a presumption of prejudice.  Def.'s Mot. Transfer at 11–17.  Regarding size, Defendant explains that the total population of D.C. is approximately 690,000, which makes D.C. the

smallest federal district in the nation.  *Id.* at 11–12.  Thus, Defendant claims that because of

D.C's "compact" size it is "impossible" for prejudice not to attach.  *Id.* at 11.  But as the

Government argues in response, the "relevant question" is not simply how populous a district is

relative to others, but "whether it is large enough that an impartial jury can be found."  Gov't's

Transfer Opp'n at 6–7.  As other courts in this district have pointed out, the *Skilling* court itself

"recognized a 'reduced likelihood of prejudice where [the] venire was drawn from a pool of over

600,000 individuals.'"  *United States v. Brock*, No. 21-cr-0140, 2022 WL 3910549, at *6

(D.D.C. Aug. 31, 2022) (quoting *Skilling*, 561 U.S. at 382).  Similarly, "the District's population

is greater in size than those few cases in which the Court has found that transfer to a different

jurisdiction was constitutionally required" and it is "larger than population sizes that the

Supreme Court has found reduced the likelihood of prejudice."  *United States v. Rhodes*, No. 22-

cr-0015, 2022 WL 2315554, at *21 (D.D.C. June 28, 2022) (listing examples, including *Mu'Min

v. Virginia*, 500 U.S. 415, 429 (1991), in which the Supreme Court found no presumption of

prejudice despite a jury pool of only approximately 182,000).  As every other court to consider

the question in connection with a January 6 prosecution has held, the size of D.C. does not weigh

in favor of a presumption of prejudice.

Defendant next argues that "an enormous share of District of Columbia residents have

significant and unique connections with individuals or institutions that were affected by January

6."  Def.'s Mot. Transfer at 12–13.  Defendant further claims that "even District residents that

have no direct connection to the government reported feeling deeply traumatized by the events

that took place."  *Id.* at 13.  This is unpersuasive, as surely most crimes have a "unique" impact

in the local area, and courts have held that a fair trial is possible even where that impact is a

result of particularly heinous crimes.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015)

(affirming denial of motion to transfer venue in Boston Marathon bombing case); *see also*

*Ballenger*, 2022 WL 16533872, at *3 (listing additional examples and explaining, in the context

of a January 6 prosecution, that a "fair trial is possible even if an event had a significant impact

on a community").

Defendant also contends that prejudice is likely because D.C. has a "huge proportion of

. . . residents [that] work for the federal government[.]"  Def.'s Mot. Transfer at 11.  However,

many government employees likely were not directly affected by the events of January 6 and,

regardless, "[v]ague insinuations that federal employees are biased by their employment

represent 'exactly the kind of conjecture that is insufficient to warrant transfer prior to jury

selection.'"  *Ballenger*, 2022 WL 16533872, at *2 (quoting *United States v Bochene*, 579 F.

Supp. 3d 177, 181 (D.D.C. 2022)).  Finally, Defendant argues that, because "an overwhelming

number of District of Columbia residents—over 92 percent—voted for President Biden," and

because the Government alleges that Mr. Coffee and others "did what they did in order to

prevent Joseph Biden from becoming President," D.C. residents are necessarily less likely to be

impartial.  Def.'s Mot. Transfer at 15.  But such reasoning has been soundly rejected by the D.C.

Circuit and district courts considering similar arguments in January 6 cases.  *See Haldeman*, 559

F.2d at 64 n.43 (explaining that "a community's voting patterns" are not "at all pertinent to

venue"); *see also Brock*, 2022 WL 3910549, at *6 (rejecting January 6 defendant's argument that

the voting patterns of D.C. residents demonstrate a likelihood of prejudice); *Eicher*, 2022 WL

11737926, at *3 (same); *Ballenger*, 2022 WL 16533872, at *3 (same).

In sum, the size and characteristics of D.C. weigh against a presumption of prejudice.

The Court is confident that, as in the numerous other January 6 cases that have been tried in this

District (including before the undersigned), thorough voir dire will be sufficient to root out any

prejudice along the lines suggested by Defendant that calls into question a potential juror's ability to be impartial.  *See Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").

### B.  Pretrial Publicity

Defendant emphasizes that "media coverage may be another outside influence to the bias" of D.C. residents.  Def.'s Mot. Transfer at 18.  Specifically, Defendant claims that the "hundreds of January 6 videos and photos circulated over the last 15 months capture the scene of the alleged January 6 crimes," and that the public may confuse "crimes committed by many other people" for Mr. Coffee.  *Id.* at 19.  However, "[p]rominence does not necessarily produce prejudice," and even "pervasive, adverse publicity" does not necessarily compel a presumption of prejudice.  *Skilling*, 561 U.S. at 381–84; *see also Haldeman*, 559 F.2d at 61 (finding no prejudice from pretrial press coverage despite the presence of articles "hostile in tone and accusatory in content").  While there certainly has been significant media coverage of January 6, as other courts in this district have pointed out, much of it has consisted only of "straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations."  *Ballenger*, 2022 WL 16533872, at *4.  Defendant claims that D.C. residents have been exposed to more local coverage about January 6 than residents of comparable districts, arguing that, "for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in *The Washington Post*."  Def.'s Mot. Transfer at 21. Defendant also stresses that "District of Columbia newspapers have *already* published at least 500 articles about January 6, and local news syndicates have broadcast over 7000 stories about the day."  *Id.* at 20 (emphasis in original).  In general, local outlets covering local crimes more than non-local outlets is unsurprising.  More specifically, whether or not the Washington Post published more articles about January 6 than the Atlanta Journal-Constitution, "much of the

coverage of the events of January 6 has been national, not local, in nature," such that the "influence of that coverage would be present wherever trial is held." *Ballenger*, 2022 WL 16533872, at *4 (quoting *Bochene*, 579 F. Supp. 3d at 182); *see also United States v. Chapin*, 515 F.2d 1274, 1288 (D.C. Cir. 1975) ("[P]recedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, enabling the change to serve its purpose."); *Eicher*, 2022 WL 11737926, at *3 ("[M]ost communities throughout the country have been exposed to the exact same coverage [of January 6] as Washingtonians."). Most centrally, as Courts in this district have explained, "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *Brock*, 2022 WL 3910549, at *7 (citation omitted). Furthermore, to the extent that there is any risk that the jury could confuse Defendant for others whose participation in the events of January 6 received local media coverage—a very low risk, given that the jury's consideration will be limited to evidence relevant to this case—that could be easily ameliorated on cross or redirect examination.

Defendant argues that media coverage of January 6 is analogous to that in *Rideau v. Louisiana*, 373 U.S. 723 (1963), in which the Supreme Court reversed a conviction based on a finding that pretrial publicity made a fair trial impossible. *See* Def.'s Mot. Transfer at 3–4, 18– 20. But *Rideau* involved pretrial publication of the defendant's own "dramatically staged admission of guilt." *Skilling*, 561 U.S. at 382–83 (describing *Rideau*). By contrast, here, Defendant does not point to any news coverage that refers to him specifically.[1] *See* Def.'s Mot.

---

[1] The Government states that Defendant has voluntarily given interviews to news organizations about his case. *See* Gov't's Transfer Opp'n at 9. Defendant does not refer to these interviews or make any allegation that reporting on these alleged interviews influenced the jury pool in D.C.

Transfer at 19–20.  Instead, Defendant points to "videos and photos" of January 6 circulated by the media, but he concedes that "much of this evidence has nothing to do with" Defendant.[2]  *Id.* at 19–20; *see Skilling*, 561 U.S. at 384 n.17 ("[W]hen publicity is about the event, rather than directed at an individual, this may lessen the prejudicial impact."); *Eicher*, 2022 WL 11737926, at *3 ("Defendant identifies no pretrial publicity that identifies her specifically."); *United States v. Garcia,* No. 21-cr-0129, 2022 WL 2904352, at *9 (D.D.C. July 22, 2022) ("[W]hile the [c]ourt recognizes that the events of January 6 are receiving substantial attention in the media at this time, and a rigorous voir dire will be needed to ferret out potential biases, this particular case has not been subject of attention, and this fact also does not weigh in favor of transferring the case."). Despite Defendant's conclusory assertion of "blatant[] prejudic[e]," the pre-trial coverage here does not include the kind of "vivid, unforgettable information" that the *Skilling* court identified as "particularly likely to produce prejudice."  *See* Def.'s Mot. Transfer at 20; *Skilling*, 561 U.S. at 384; *see also Haldeman*, 559 F.2d at 61 (explaining, regarding the Watergate trial, that "[w]e have carefully reviewed the 'Watergate' articles submitted by appellants, and we find that the pretrial publicity in this case, although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession").

Finally, Defendant points to the results of a survey and media analysis by Select Litigation commissioned by the defense to bolster his argument that press coverage has rendered D.C. residents incapable of reaching an impartial verdict.  *See generally* Def.'s Mot. Transfer. First, the D.C. Circuit has explained that "comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices, and

---

[2] Note that Defendant's motion refers to him by the wrong name in various locations. *See* Def.'s Mot. Transfer at 7, 17, 19, 20; *see, e.g. id.* at 17 ("Mr. Judd cannot obtain a fair and impartial trial here.").

principles developed by the common law since the reign of Henry II" is favored over "a poll

taken in private by private pollsters and paid for by one side." *Haldeman*, 559 F.2d at 64 n.43.

Second, courts in this District presented with the same Select Litigation analysis have found that

"the surveys are flawed, and none supply persuasive evidence that would support a decision to

transfer the case without trying the voir dire process first." *Garcia*, 2022 WL 2904352, at *10;

*see also Rhodes*, 2022 WL 2315554, at *21 ("Having considered all of the survey evidence

presented by Defendants, the court holds that this is not an 'extreme case' in which juror

prejudice can be presumed and mandatory transfer is warranted."); *Ballenger*, 2022 WL

16533872, at *4 ("Because of the general presumption against supplanting *voir dire* with polling

evidence and because the poll submitted by Defendants fails to establish prejudice even if taken

at face value, the Court need not reach the various potential methodological problems with the

survey that the Government discusses.").

    The Court agrees that the questionable methodology and unpersuasive results of the

Select Litigation survey here do nothing to overcome the D.C. Circuit's preference for voir dire

over a privately commissioned survey.  The survey includes tendentious question phrasing that

calls its results into question.  For example, Defendant characterizes a survey result as showing

that 85% of potential DC jurors "have concluded that [January 6] defendants were trying to

overturn the election and keep Donald Trump in power."  Def.'s Mot. Transfer at 7.  But, as the

Government points out, respondents chose that answer in response to a question about those who

"forced their way into the U.S. Capitol"—a description that suggests a high degree of culpability.

*See* Gov't's Transfer Opp'n at 22.  Even taking the results at face value, they do not compel a

presumption of prejudice.  For example, Question 5 of the survey asked respondents, if they were

on a jury in a case in which defendant was charged with "crimes for his or her activities on

January 6th," whether they would be "more likely to vote that the person is guilty or not."  Def.'s

Mot. Transfer, Ex. 1 ("Select Litig. Surv.") at 14, ECF No. 62-1.  Again, this question's phrasing

is at best ambiguous—"more likely" than what?  More likely to vote a person charged with a

crime guilty than a person not charged with a crime?  Regardless, and despite the fact that the

survey only presented respondents with the options "Would" and "Would not," fully 46% of

D.C. respondents volunteered answers of "Depends" or "Don't know/Refused"—a higher

percentage of respondents than the 45% in the control jurisdiction (Atlanta, Georgia).  *See id.*

Moreover, the 52% of D.C. residents who responded "Would" is not meaningfully higher than

the 45% who said the same in the control jurisdiction, especially considering the margin of error

of plus-or-minus 4.9% in this poll.  *See id.* at 13–14.  Furthermore, as the Government points out,

the poll does not ask the key question that would certainly be probed at voir dire: "whether a

sufficient number of prospective jurors can 'lay aside [their] impression[s] or opinion[s] and

render a verdict based on the evidence presented in court.'"  Gov't's Transfer Opp'n at 22

(citation omitted).  Indeed, the closest the poll got was Question 7, which asked if the respondent

"think[s] the defendants currently charged with crimes for their activities on January 6th will or

will not get a fair trial in the District of Columbia," to which fully 80% of D.C. respondents said

they will.[3]  Select Litig. Surv. at 14.  In short, the Select Litigation survey falls well short of

showing that this case is among the extreme cases where a presumption of prejudice compels a

transfer of venue.

---

[3] The poll does not appear to have asked this question to respondents in the control jurisdiction.

### C.  Time Elapsed

More than two and a half years have elapsed since January 6, 2021.  It may be that the "decibel level of publicity about the crimes" has lowered in that time, *In re Tsarnaev*, 780 F.3d at 22, but the Court acknowledges that recent events, including Congressional hearings and reports and ongoing and potential high-profile criminal prosecutions and civil suits arising out of the events of that day, have likely kept January 6 more toward the top of the public mind than it would be otherwise.  However, as Defendant has not suggested that his case in particular has been the subject of any D.C. or national press attention, any residual press coverage of January 6 is merely "a factor that must be taken into consideration in jury selection."  *Garcia*, 2022 WL 2904352, at *9.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Transfer Venue (ECF No. 62) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: July 11, 2023.                                    RUDOLPH CONTRERAS
                                                         United States District Judge