UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA   )
                           )
          *v.*             )          **Case No. 1:21-cr-0327 (RC)**
                           )
LUKE RUSSELL COFFEE,       )
                           )
          Defendant.       )

## DEFENDANT'S SUPPLEMENTAL BRIEF

Comes now the Defendant, LUKE RUSSELL COFFEE, by and through undersigned counsel, and pursuant to the Court's minute order dated January 25, 2024 respectfully submits his supplemental brief as follows:

## INTRODUCTION

The Court should acquit Mr. Coffee of all charges. The evidence presented by the government did not show beyond a reasonable doubt that he is guilty of any of the counts in the Indictment at ECF No. 44. For every count, the Government failed to show the requisite intent or mens rea. The Government otherwise failed to show evidence that Mr. Coffee knowingly or willfully violated all the elements of any count charged. he evidence showed that Mr. Coffee never used the crutch as a dangerous weapon with the intent to cause serious bodily injury or death. Instead, the Government in its allegations and case-in-chief attempted to improperly apply the laws as written and intended.

Mr. Coffee requests that this Court review the transcripts (that will not be available for some weeks) to note that in its opening and closing arguments the Government misrepresented and mischaracterized what it called "evidence." The most astonishing example is that even after alleged victim Officer Morris testified that Mr. Coffee did not contact or assault her, and that he

did not push her or cause her to fall backwards, the Government stated the polar opposite about her testimony in its closing argument. She said that any push by Mr. Coffee against other officers did not cause her to fall backward. Yet the government changed her words in its closing argument. It did the same by falsely claiming that Mr. Coffee saw "area closed" signs at ~4 p.m. One set of folded bike racks surrounded by many people led to the misrepresentation that Mr. Coffee saw the folder racks and somehow he knew the area filled with thousands of people was closed - for the protection of the Vice President no less. The government also extracted a still photo from video at the tunnel where Mr. Coffee was turning sideways after being sprayed multiple times in the face with O/C spray, and narrated out of whole cloth that he was using the crutch like a weapon. The government tried to argue against defense of others because in the short minutes that he was at the tunnel, he personally did not try to aid Ms. Boyland who was unconscious on the ground. Yet the exhibit video shows that when Mr. Coffee peacefully with empty hands walked up in the direction of Ms. Boyland and the pile of bodies on top of her, he was physically assaulted by Officer Morris. He did not try to hit her back. He called for prayer and for everyone to stop the fighting.

Because of the Government's failure to prove each element of each count, and its failure to present evidence that showed guilt beyond a reasonable doubt (or anything more than inferences upon inferences), Mr. Coffee should be acquitted of all charges.

### SUMMARY

This case is about a religious man, Luke Coffee, who possesses a deep conviction for truth while maintaining a sense of humor despite a background where he suffered severe physical injury and personal tragedy. Working in his business of film making, he travelled to Washington, D.C. from Texas to document what he had heard would be an historic event. The January 6, 2021 rally, alternately called "Save America" and "Stop the Steal," trended across social media with

indications that it would be huge.  As a documentarian with planned work interrupted by COVID-19 lockdowns, Mr. Coffee decided to go to D.C. as a combined work and friendship road trip with his best friend Brady Hall.

Despite the government's weak attempts to create a narration that Mr. Coffee  was angry and had political motives for going to Washington, D.C., his testimony about the trip's purpose was corroborated by Mr. Hall during trial.  There was no political motive. Mr. Coffee was going to interview people, the more unusually dressed the better as time passed on January 6, 2021.

The travel and conversation encompassed no anger or motive to do anything besides walk around and film on January 6th.  The large part of the conversation involved to friends catching up after an extended period of not seeing each other. (See transcript). The drive included comedy contributions for a show called "Conspiracy Castle" along the route to D.C. Mr. Coffee brought props and costumes. (See Defense Exhibits 4 a-f). They planned to go on a duck hunting and outdoor sportsman trip at a friend's property after departing D.C. As testified to, input to Conspiracy Castle during travel made sport of various topics and ongoing drama. No "side" was immune from the light-hearted, down to earth, comedic reality checks.

Having no evidence of any intent by Mr. Coffee before or on January 6, 2021 to violate any statute as charged, the government tried to misportray cherry-picked communications. The government took private messaging, out of context and without the phone calls and dialogue that was related to texts. The government labelled and then unjustly investigated Mr. Coffee as being a domestic terrorist in order to invade his private messages and use them out of context. Without communications being placed in any true context, the Government unjustly applied all its efforts to twist good motivation and post-January 6th beliefs and sarcasm into "intent" to commit crimes on January 6th. The cherry-picked and out of context private messages do not show the sarcasm

and banter that was present when the words were written.  They do not show phone calls that occurred in the period between texts. Notably, the government did not have its FBI investigator, Mr. Hillman (now retired) attempt to interview the text recipient. The government preferred to make up a story rather than interview the conversation participant, if we assume the government did not fail to provide evidence favorable to Mr. Coffee. It is more than unusual that the government used the out of context private texts because the government never provided any discovery or indication that it interviewed the person through any local FBI office. Since the discovery provided to Mr. coffee was "scoped," he was never afforded the opportunity to correlate phone calls and other texts to show context, sarcasm, or frustration.

The most applicable words for the private texts and the few posts after January 6, 2021 are "sarcasm"  and "frustration" - as Mr. Hall and Mr. Coffee testified. Mr. Coffee learned right away that he was classified as a domestic terrorist. He was in a state of disbelief and frustration that this could happen in America and to him. Mr. Hall made clear that Mr. Coffee will use sarcasm rather than have any angry argument. Mr. Hall also highlighted that for all the years he has known Mr. Coffee, he has never seen a violent act or inkling of anger that would lead to violence by him. As both men testified, and were backed up by pictures showing lack of any political seriousness, (Defense Exhibits 4 a-f) the road trip to D.C. included humor for the comedy production "Conspiracy Castle." As shown by testimony (See Mr. Hall's and Mr. Coffee's transcripts) there was no plan to go to the U.S. Capitol. Neither man was aware of anything about the ongoing Electoral Count status or that Vice President Pence was at the U.S. Capitol. The government tried to impose "intent" to enter restricted grounds by using a private text *from after January 6th* that mentioned Mr. Pence sarcastically and is out of any and all contexts. All evidence showed that Mr. Coffee did not know anything about VP Pence. Nor did the government provide an iota of evidence

that the west side of the US Capitol was "restricted" for protection of the Vice President. Ms. Hawa insinuated that the area was restricted for Section 1752 protection when not a single email, document, meeting minute, phone call log, or any shred of evidence showed that anyone enacted the area closure for anything besides safety regarding the inaugural stage build out. Ms. Hawa's testimony included that the USSS would be involved with such an outdoor restricted area, yet there was no evidence of anything besides an email stating the Vice President would only be visiting the inside of the building. He was never scheduled to be outside on the west or anywhere, and there was no evidence that the outdoors on the west was restricted for his protection under 1752 purposes. The Section 1752 statute requires that the restricted area be specifically for USSS protectee security. No evidence showed that to be the case - and the statute is being abused.

Mr. Hall testified that Mr. Coffee wore a costume on January 6th. He had on "disco pants," plastic, yellow sunglasses, a cowboy hat, weird snakeskin boots, and a duck hunting jacket. They stayed at the ellipse/rally area well after President Trump's speech ended and people departed to go elsewhere. Because Mr. Coffee spent his time interviewing people, (see defense Exhibit 6) he had little to no awareness of the content of the speeches broadcast over speakers across the vast rally area. Mr. Hall stated that he departed to try to meet friends while Mr. Coffee stayed in the rally area. Mr. Hall stated that at 3:30 p.m. his phone picture indicated that he still was at least a block from the west lawn of the Capitol. There was a peaceful crowd extending well back off of the grounds, while the expanse of people made it difficult to see the scope of the crowd that was on the west lawn. He noted that Mr. Coffee was still somewhere well behind him, nowhere near the Capitol grounds' west entrance at 3:30 p.m.  Phone contact was not possible because Mr. Coffee's phone battery had died. There was not a single sign in Mr. Hall's view that anything ahead

was "closed."  He saw an expansive crowd just hanging around doing nothing more than milling prior to his departing the area without ever entering the grounds.

Mr. Coffee interviewed more people along the route that he thought was where the "march went." There was not much of a march since he was at the tail end of movement. He interviewed people along the road. (See Defense Exhibit 5). He had taken at least three hours of documentary video before camera and phone battery deaths. His backpack was especially designed for his $3000.+ camera and some peripherals. He had no weapons or dangerous objects. Mr. Coffee's only goal was to interview people and create a documentary.

When Mr. Coffee arrived near the entrance path by the west lawn somewhere around 4:00 p.m., there was a mass of people milling about. (See Govt. Exhibits 406A). The government shows about a three second snippet in its Exhibit 406 video where some folded up bicycle racks are neatly standing on the sidewalk. The government then falsely claims without evidence that Mr. coffee was able to see thru the density of people as he walked and that somehow these unmarked, folded bike racks gave him indication that the area was closed. This is a grand stretch of imagination particularly since there were no "area closed" signs.  The small white marking, not facing Mr. Coffee, merely said "Property of the U.S. Capitol Police." Mr. Coffee did not see any remnant of the snow fencing that was removed shortly after 1:00 p.m. by US Capitol Police and other unknown people. (CCTV of sign removal shown in Court; and Defense Exhibit 61). He saw no visible barricades or signs indicating a closed area. (See Defense Exhibit 9 and Govt. 406A shown at trial).

Mr. Coffee proceeded toward the building, after stopping and talking to people along the way. His testimony showed that he only moved toward the area called "the tunnel" after hearing cries for help and witnessing fighting between protestors and police. He advanced open handed and first talked to the protestors near the entrance. He told them multiple times to stop and pray.

Mr. Coffee attempted to peacefully talk to the police - only D.C. Metropolitan Police (MPD) were present. MPD Officer Lila Morris immediately began beating Mr. Coffee's hands and arms with a long and heavy stick she had acquired. Mr. Coffee testified that a crutch was at his feet, and he picked it up and raised it overhead to make himself as big as possible to stand in the gap and stop the fighting. He noted at least one person next to his foot on the ground.  He told both the police and protestors to stop and pray - despite the government's mischaracterization of evidence to claim he only told the police to stop. (Videos with stop and pray)

Mr. Coffee was sprayed with heavy doses of O/C spray at his head and face at least three times as shown by multiple videos. The chemical irritant caused his eyes to close and for him to become temporarily blinded (for at least 45 minutes). He bowed his head and held the crutch parallel to the ground, at waist or shoulder height. (Govt. Exhibits 302D and 302H). He never used the crutch in an axe or bat-like motion to hit anyone despite the government's attempt to misrepresent a snapshot from a video. (Govt. exhibits 32E, 32G where Mr. Coffee was spinning and not striking out at anyone). Completely disoriented and blinded, he stepped (and might also have slid) forward with a possible push from behind where he pushed into Officer Sajumon. Self-defense, defense of the person on the ground who needed medical aid, and involuntary reflex each played a part in the push. Mr. Coffee honestly stated that in retrospect all seemed to happen at once and the action lasted only for seconds. He was only up in front of the tunnel for around one minute. His being disoriented and then choked for oxygen after being attacked with a chemical irritant made it impossible to discern how much was involuntarily reflexive in nature, and what per cent was part of defense of self and others. As a result, the video shows that Mr. Coffee created a space where protestors were able to pull Rosanne Boyland out of the tunnel and attempt CPR. (The MPD sprayed O/C/ on those trying to administer life-saving aid.

Mr. Coffee never once used the crutch with the intent or in a manner to cause serious bodily injury or death. He never swung it overhead. He never used it as a spear. He held it over his head in a non-threatening manner parallel to the ground, or otherwise parallel to the ground in defense after having been blinded and disoriented. Any "push" was not anything more than to defend self and the person trapped on the ground. The government made a great deal that Mr. Coffee did not render aid to Ms. Boyland. The entire event was over for him in a matter of about one minute. He did not have any opportunity to render aid since he was immediately attacked by Officer Morris and shortly thereafter by at least three rounds (if not seven or more) of yellow OC spray that caused him to pass out, unable to breathe. His actions did allow others to pull Ms. Boyland out into the air when the MPD did nothing after she was beaten repeatedly by Officer Morris.

Mr. Coffee never touched or pushed Officer Morris, which she confirmed on the stand. She also testified that Mr. Coffee did not push anyone into her. Despite the government's effort to manipulate facts, Officer Morris was clear that she was pulled backward and may also have slipped because of the slippery, gas-covered flooring. Mr. Coffee recalled that Officer Sajumon indicated there was no assault and said they "were good." The events led to Mr. Coffee falling on the ground unconscious for a period, choking for air. He was helped to a location with fresh air where others tried to assist him in cleansing his eyes of the chemical irritant. (Defense Exhibit 14 a-d; and testimony by Lindsay Graham.

Congress was in recess as of ~2:15 p.m.  No MPD officer witness stated they were assisting any USCP officer. The MPD officers went to the front of "the tunnel" after the USCP retreated elsewhere in the building. The MPD officers testified that they had orders to stay in the tunnel on the front line. They had no orders regarding protection of the Vice President or any government business. They had no orders to clear an obstruction to commerce. There was no commerce on the

U.S. Capitol grounds. Officer Carter Moore stated that before he arrived at the tunnel, he had participated in escorting all civilian staff workers out of the Capitol building. He proceeded to the tunnel before Mr. Coffee's arrival to be a peacemaker.

The Government preposterously tries to claim that Mr. Coffee impeded or obstructed the USSS protection of Vice President Pence. Inspector Hawa admitted that the Vice President (VP) had been moved to the underground garage at or around 2:25 p.m. and that his motorcade had moved off the east plaza by 1:59 p.m. With Mr. Coffee's arrival at or after 4:00 p.m. on the grounds, there was no ongoing government business, no Electoral Vote counting, and no interference by him with the USSS protection of VP Pence. The government provided speculation with no factual evidence. Ms. Hawa speculated that any protestor anywhere on the U.S. Capitol grounds would cause the USSS to continue security planning - as if planning and evaluation were not always part of the USSS' job. Yet incongruently Ms. Hawa said anyone with a press badge could be on the grounds or in the building. That is not the USSS protocol standard despite Ms. Hawa's false allegation. No factual evidence was provided by anyone or any document that Mr. Coffee in any way impeded or obstructed USSS protection of Mr. Pence, who was in the bomb-blast protected concrete garage by 2:25 p.m. on January 6, 2021. Ms. Hawa grudgingly admitted that an IED/pipe bomb threat was part of the considerations to move the VP and his motorcade underground.

The Government showed no interstate or intrastate commerce impacted at all by the events at the U.S. Capitol while Mr. Coffee was present. The D.C. Mayor declared a curfew in a D.C. registered document by 2:30 p.m. Her January 6th order just stated the curfew was to prevent nighttime violence, with passing mention about events at the U.S. Capitol. Mayor Bowser tweeted about her curfew at 2:31 p.m. on January 6th. (See Defense Exhibit 56). Mr. Coffee did not cause

the curfew order. He was still at the Ellipse area. He did not directly or indirectly cause any obstruction related to commerce.

The government unconstitutionally presented retail sales data for the entire day as its commerce evidence for support to the Civil Disorder charge. The Section 231(a)(3) statute requires simultaneous obstruction of commerce with the civil disorder where police are on mission to stop violence and clear obstructions to commerce. The government showed no evidence that either the USCP or the DC MPD were on mission to clear an obstruction to commerce. The government cannot ever show such evidence because there were never any such orders and there was no obstruction of any commerce, substantial or not. The government's MPD witnesses said their mission was to stay on the front line in the tunnel, presumably to prevent entry into the building. They had no mission to go outside the tunnel to stop anyone or anything.

The government failed to state that Mayor Bowser told the entire region to stay out of D.C. on January 6th because of First Amendment demonstrations. The data misrepresented that businesses were open when many closed due to the Mayor's warning starting on January 2-3, 2021. The data presented by retired FBI Agent Hillman, who had nothing to do with its compilation, ignored hotel occupancy rates that exceeded any historical data. The government compared January 5th with January 6th, when many of the rally attendees departed D.C. on January 6th. not only could nobody go outside for takeout food, but businesses chose to close and not provide food that night. The data ignored that COVID restrictions still prevented indoor dining at more than a 25% occupancy rate even for hotels. Essentially, the data was a misrepresentation of retail sales where nothing done by Mr. Coffee had any impact on interstate commerce, and when no police were on mission to clear non-existent obstructions to commerce ever on January 6, 2021.

After 45 minutes of clearing his eyes, Mr. Coffee returned to his hotel. Mr. Hall noted that he looked dazed and as if something had happened. Because of the events and assault against Mr. Coffee, the two friends cancelled the remainder of their trip and returned to Texas. Mr. Coffee received threats to the point that he went to a secluded area to avoid any personal attacks. He did not hide from the FBI or any law enforcement.

The previously submitted elements of the crime memorandum are incorporated herein as necessary and attached as an Exhibit for ease of reference. Mr. Coffee provided his closing briefing slides. Additional caselaw and evidence references are included below.

## DISCUSSION AND ARGUMENT

### I.  The Court Should Acquit on Count One 18 U.S.C. § 231(a)(3) "Civil Disorder."

The crime of Section 231(a)(3) "Civil Disorder" is:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.[1]

### A.  <u>The § 231(a)(3) elements require three prongs with a simultaneous nexus of activities</u>:

**<u>Prong 1.</u>**  A defendant intentionally and knowingly commits or attempts an act to obstruct, impede, or interfere with a fireman or law enforcement officer; and

---

[1] The government and indictment (ECF 44 at 2) change the tense of the words in the statute. Obstructs is replaced by "obstructed" for example. The government incorrectly titles the crime "Obstructing Officers During a Civil Disorder." That is not the crime  of "Civil Disorder" as legislated, and infers that defendants need only somehow obstruct, impede, or interfere with any law enforcement officer anywhere at any time where obstruction of commerce or a federal function can have occurred past or future tense, including at a location where the defendant was not located.

**Prong 2.**  The fireman or law enforcement officer is performing official duties incident to and during a civil disorder that involves three or more violent people; and

**Prong 3.** The civil disorder in any way concurrently *obstructs*, *delays*, or *adversely affects* commerce or articles moving in commerce or a federally protected function *where the police are trying to clear the obstruction.*[2][3]

The above three prongs must occur simultaneously. The Defendant in the present tense must intentionally and knowingly obstruct, impede, or interfere with a law enforcement officer or fireman who in the present tense is *officially* and not under color of law responding to a civil disorder consisting of violent acts by three of more people, and he or actors in the civil disorder in the present tense must adversely be affecting commerce or the movement of goods; or are obstructing a federally protected function such as mail delivery that the police are trying to clear from obstruction.[4]

**B. Definitions:**

1. **18 U.S.C. § 232 definitions are**:

    (1) "civil disorder" means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual.

    (2) The term "commerce" means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia.

    (3) The term "federally protected function" means any function, operation,

---

[2] The government inserts "travel" when that is not part of the statute or definition of commerce.
[3] The highlighter portion was added from the prior memorandum based on added caselaw research.
[4] Since the government charges in Counts Two and Three that Mr. Coffee made contact assault with two MPD officers with the goal of committing felony Civil Disorder, it must prove that he knowingly and intentionally tried to obstruct a government function or commerce that police were on mission to clear of obstructions.

or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails.

. . .

(7) The term "law enforcement officer" means any officer or employee of the United States, any State, any political subdivision of a State, or the District of Columbia, while engaged in the enforcement or prosecution of any of the criminal laws of the United States, a State, any political subdivision of a State, or the District of Columbia . . . .

18 U.S.C. § 232

The law enforcement officer <u>must have been legally (not under color of law) conducting his official duties</u>. Fourteenth Amendment and 42 U.S.C. Section 1983.

**2. <u>Section 6 of 18 U.S.C. Defines Departments and Agencies</u>.**

The term "department" means one of the executive departments enumerated in Title 5, § 1.

The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.

**3. Police "Official Duties"** must be shown in the police entity's authority under statute and internal rules of authority and conduct. In the case of the MPD, their execution of duties in and on the outside of the U.S. Capitol and its grounds requires a decision and request for assistance by the U.S. Capitol Police Board.

The Metropolitan Police force of the District of Columbia are authorized to make arrests within the United States Capitol Buildings and Grounds for any violation of any such laws or regulations, but such authority shall not be construed as authorizing the Metropolitan Police force, **except with the consent or upon the request of the Capitol Police Board, to enter such buildings to make arrests**

13

**in response to complaints or to serve warrants or to patrol the United States**

**Capitol Buildings and Grounds**.

2 U.S.C. § 1961[5]

Obstructing or impeding (affecting) commerce that is wholly within D.C. requires that there must be substantial effects on interstate commerce where a clear nexus is shown between D.C. and the substantial effect on interstate commerce.[6] [7]

**4. A person acts "knowingly"** if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. For "knowingly" and intent when the crime is not one of strict liability: "The Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. U.S.*, 524 U.S. at 191-92. "While the government must show that a defendant knew that his conduct was unlawful, the government does not need to prove that the defendant was aware of the specific law that his conduct violated." 1:23-cr-00170-CJN ECF No. 40 at 6, Filed 12/01/23. Here, he must be aware of all three prongs where his intentional and knowing act has a direct effect on the police

---

[5] The Government incorrectly states that the MPD have the authority to police the Capitol grounds and buildings. ECF No. 101 at 3. Any such MPD actions require a request by the USCP Board, that consists of the Sergeants at Arms for the Senate and House, and the Architect of the U.S. Capitol. 2 U.S.C. § 1961. The USCP chief is not a voting member of the USCP board.

[6] Noneconomic intrastate activity may not be federally regulated unless "the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995). In *Lopez*, the Supreme Court limited federal commerce power to three categories of activity: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "those activities that substantially affect interstate commerce." 514 U.S. at 558-59. ((See also *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1068–69 (D.C. Cir. 2003)).

[7] "As we said in *American Building Maintenance*, a corporation is generally 'engaged in commerce' when it is itself 'directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce.'" *United States v. Robertson*, 514 U.S. 669, 672 (1995) See also *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U.S. 186, 195 (1974).

response to Prongs 2 -3. There must be a nexus in time and location that the defendant is aware of for a conviction.

5.  The Oxford and Meriam Webster dictionaries confirm that the term "function" (non-mathematical) means an activity. "Federal function" is not a person or organizational entity. A *federal function* in plain English means *an activity conducted by* a federal department or agency. (Oxford and Merriam-Webster dictionary definitions).

As written under § 231(a)(3), U.S. departments and agencies may perform a federal function. The case evidence must show what federal function, such as mail delivery, was obstructed while simultaneously Mr. Coffee was alleged to have impeded, obstructed, or assaulted an MPD officer, where Mr. Coffee must have knowingly and voluntarily intended to obstruct that officer, who was responding to violence by three or more people with simultaneous action where the police were trying to clear the obstruction to commerce or a federal function. the nexus is not optional as the law is written. Mere presence by a defendant somewhere in the vicinity is not enough. An alleged assault is not enough.

## CASELAW

There are no apparent cases decided by the U.S. Supreme Court about the Constitutionality of 18 U.S.C. Section 231(a)(3) Civil Disorder.

Applicable caselaw involves cases related to commerce while not necessarily Section 231. First the distinction is made when economic versus non-economic activity is the basis of the statute, and whether the law regulates interstate versus intrastate activity. "*Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." *U.S. v. Morrison*, 529 U.S.

598, 611 (2000). Section 231(a)(3) regulates a criminal act and not economic activity. That alone

does not make the law unconstitutional. Morrison was about a gun law with no direct hook to

commerce. In declaring the law unconstitutional, the Court held:

> The reasoning that petitioners advance seeks to follow the but-for causal chain
> from the initial occurrence of violent crime (the suppression of which has
> always been the prime object of the States' police power) to every attenuated
> effect upon interstate commerce. If accepted, petitioners' reasoning would
> allow Congress to regulate any crime as long as the nationwide, aggregated
> impact of that crime has substantial effects on employment, production, transit,
> or consumption.

*U.S. v. Morrison*, 529 U.S. 598, 615 (2000)

Facially Section 231(a)(3) appears Constitutional because of a direct link between the

criminal act of obstructing police who are responding to clear obstructions to commerce. That

means that "*as applied*" the non-economic criminal act must be directly tied to the prong about

obstructing commerce where the police must be trying to clear the obstruction. The Court holding

cannot be that Mr. Coffee allegedly obstructed the MPD who were trying to keep people out of the

building, with no mission related to clearing an obstruction of commerce. That is what appears to

be the unconstitutional application the government seeks, where it alleges that no evidence of a

police mission to clear the channels of commerce is required. Further, the government is using the

law  to usurp police power where anything might interrupt D.C. retail sales during any unspecified

time period.  The government's charges and evidence eliminate the direct link between Prong 1

and police responding to a civil disorder where they are (under Prong 3) trying to clear commerce

simultaneously. The law as applied by the government is unconstitutional, even if facially valid

regarding commerce. The "federal function" may be facially unconstitutional unless an argument

under the "necessary and proper clause" by the government is successful. The US Supreme Court

respects the police powers of the states in its rulings about noneconomic, criminal activity in statutes at the federal level.

If not already clear, the US Supreme Court's position remains:

> We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. *Lopez*, 514 U.S. at 568 (citing *Jones Laughlin Steel*, 301 U.S., at 30). In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.

*U.S. v. Morrison*, 529 U.S. 598, 617-18 (2000)

No other cases appear to use the D.C. application that delinks Prong 1 and Prong 3 where commerce is not obstructed right then and there by the civil disorder and the police are trying to quell the obstruction. For example:

> A defendant may be convicted of violating the statute only if the civil disorder during which the law enforcement officers are lawfully performing their lawful duties obstructs, delays or affects interstate commerce. . . . [T]his means that the officers are, among other things, attempting to quell an interference with interstate commerce. When a person deliberately commits some act to obstruct, impede or interfere with those officers, that person is impacting interstate commerce. That person is trying to prevent, or is preventing, the officer from performing duties which include the protection of interstate commerce.

*United States v. Howard*, 2021 WL 3856290, at *10.

The AUSAs contradict the DOJ standard from cases elsewhere in the U.S. The charges and evidence here and in other January 6th cases completely delinks the simultaneity required between Prong 1 and Prong 3 so that the law is being applied unconstitutionally in January 6th cases:

> an individual can be charged under Section 213(a)(3) only if he or she impedes or attempts to impede police or firefighters--the very public safety professionals charged with containing, mitigating, and ultimately ending the public disturbance, and thereby restoring the channels and instrumentalities of interstate commerce.

Gov't Resp. 10" *United States v. Phomma*, 561 F. Supp. 3d 1059, 1066 (D. Or. 2021).

17

**Non-economic activity requires** Congressional findings as related to commerce. There are no such thing regarding January 6th cases for Civil Disorder. Non-economic activity cannot be aggregated according to the U.S. Supreme Court under *Lopez* and *Morrison*. Under 231(a)(3), the law is written where that the civil disorder is affecting commerce that police are responding to. But the DOJ ignores the simultaneous third prong requirement, and where the civil disorder is impacting commerce and police have the mission to clear the obstruction. The charges should not proceed without Congressional findings when the crime in non-economic. It is implausible that the statute is being constitutionally applied when the alleged impact on commerce is not shown to substantially impact commerce at the time of the alleged civil disorder, or that police were trying to clear any immediate obstruction of interstate commerce.

### EVIDENCE

The government showed no evidence that the US Capitol Police Board requested the presence of the DC MPD on the U.S. Capitol grounds. The MPD were not legally policing on the U.S. Capitol grounds. Because of this, there is no need to reach the issue of whether excessive force made their actions "unofficial." No witness provided that they held any police jurisdiction authority or card (as is standard for standing authority to respond outside of jurisdiction) for the Capitol grounds. The MPD's jurisdiction is covered under D.C. code and no evidence was shown of any code change prior to January 6, 2021 that allowed the MPD to jurisdictionally conduct policing on the U.S. Capitol grounds. Officer Morris stated that she was ordered by her sergeant to go to the U.S. Capitol. The two MPD witnesses' claims of a "10-33 emergency authority" is false when it comes to the U.S. Capitol grounds. The statute is clear.

While USCP officers by statute can operate in D.C. if the officer witnesses a crime, there is no such reciprocal allowance for any local or state police such as the state-equivalent D.C. MPD

to conduct police duties on the U.S. Capitol grounds outside of a USCP board request. The government provided no document, meeting minute, witness testimony, or record to show the USCP board requested the MPD to be on the U.S. Capitol grounds or in the building. Instead, the

Further, **not a single witness stated that any officer was protecting or restoring interstate commerce. No MPD witness said they had a mission to clear an obstruction to commerce or a federal function**. Instead, testimony showed that the MPD officers were ordered to go to the front of the tunnel and hold the front line. There were no USCP being directly assisted because they had withdrawn. The MPD officers had a limited mission to keep people out of the tunnel.

Mr. Coffee must be acquitted because: By testimony no MPD officers who engaged with Mr. Coffee had any USCP board authority to be in the tunnel or on the grounds; by testimony no MPD had any duty or orders to end an obstruction of commerce; and by testimony none had the order or duty to stop an obstruction of any federal function. Each MPD witness corroborated that their mission was only to hold the line at the front of the tunnel. If in arguendo he was guilty of an assault, which no evidence showed he was, he cannot be guilty of civil disorder by the same conduct that had no link to commerce. The government is encouraging this Court to unconstitutionally apply Section 231(a)(3).

Timings from testimony proved that nothing in or at the tunnel had anything to do with VP Pence's protection. Ms. Hawa speculated about possibilities, but had no facts that USSS protection of VP Pence was impeded one iota by Luke Coffee at 4:00 pm and afterward on January 6th. Pence was moved to the bomb-blast protected garage at 2:20. His motorcade was moved off the East Plaza at 1:59 p.m. where orders to move were given at least by 1:30, coincident with the second pipe bomb discovery ten minutes earlier.  She admitted that the IED/pipe bomb could have been

the reason as timings showed. She provided nothing factual about Mr. Coffee obstructing USSS protection. Her testimony was that his presence "could have impacted security planning." She even asserted that no act was required of any January 6th defendant anywhere on the grounds. She alleged that just mere presence - where she and the government ignored the simultaneous prongs of the Section 231(a)(3) Civil Disorder statute - made defendants guilty.

The government never showed any intent by Mr. Coffee to obstruct or impede any police officer. He did not try to force his way to the door. His intent was to be a peacemaker. That transformed to self-defense and defense of others as he was beaten and blasted repeatedly with OC spray. While the law might not outright require Mr. Coffee to know the extent of the obstruction to commerce or a federal function, the government was required to provide evidence that Mr. Coffee intended to obstruct or impede officers who were trying to end an obstruction to commerce or a federal function. The government provided no such evidence, where even the complete lack of a dispersal order was acknowledged by MPD (former) witness Carter Moore.

Because the government failed to prove with any evidence, let alone beyond a reasonable doubt, that the MPD officers were officially performing duties at the U.S. Capitol, or that the MPD officers were obstructed by Mr. Coffee during their response to unblocking and protecting commerce or a federal function, Mr. Coffee must be acquitted.

**II.  The Court Should Acquit on Count Two 18 U.S.C. §§ 111(a)(1) and (b); Assaulting, Resisting, or Impeding Metropolitan Police Officer Sajumon Using a Dangerous Weapon**

   The government did not prove every element of §§ 111(a)(1) and (b) as contained in the indictment beyond a reasonable doubt.

### The Statute

   **(a)** In General.  Whoever—
   **(1)** forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties.

      shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

   **(b)** Enhanced Penalty.  Whoever — in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. §§ 111(a)(1) and (b) (Emphasis added)

### Count Two Of The Indictment:

On or about January 6, 2021, within the District of Columbia, **LUKE RUSSELL COFFEE,** using a deadly or dangerous weapon, that is, a crutch, did forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, that is, S.S., an officer from the Metropolitan Police Department, while such officer or employee was engaged in or on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

   **A. § 111(a)(1) (Non-felony Simple Assault Lesser Offense) Elements the government  must have proven:**

      1. The defendant acted forcibly against MPD Officer Sajumon; and

      2. The defendant's forcible or violent act was knowing, voluntary, and intended; and

3.  The defendant's forcible or violent act consisted of assaulting, resisting, opposing, impeding, intimidating, or interfering with MPD Officer Sajumon (alleged victim) who must have been assisting a specific USCP officer directly and

4.  The assisted USCP officer must have been acting lawfully, as must have MPD Officer Sajumon in assisting the specific USCP officer, and within the capacity of his or her official duties (as must have MPD Officer Sajumon); and

5.  Mr. Coffee must have had the apparent, imminent ability to injure Officer Sajumon, and

6.  Mr. Coffee's conduct was not justified by the use of reasonable self-defense or an act in defense of others.

**B.  Assault with intended physical contact, an intent to commit another felony, and use of a deadly or dangerous weapon to commit the acts.**

1.  The defendant acted forcibly against MPD Officer Sajumon; and
2.  The defendant's forcible or violent act was knowing, voluntary, and intended; and
3.  The defendant's forcible or violent act consisted of assaulting, resisting, opposing, impeding, intimidating, or interfering with MPD Officer Sajumon (alleged victim) who must have been assisting a specific USCP officer directly and
4.  The assisted USCP officer must have been acting lawfully, as must have MPD Officer Sajumon in assisting the specific USCP officer, and within the capacity of his or her official duties (as must have MPD Officer Sajumon); and
5.  Mr. Coffee must have had the apparent, imminent ability to injure Officer Sajumon, and
6.  Mr. Coffee intentionally and voluntarily made physical contact with Officer Sajumon and
7.  Mr. Coffee intended to use the forcible contact with Officer Sajumon to commit another felony (obstruction of a federal function or commerce under Civil Disorder), and
8.  Mr. Coffee's conduct was not justified by the use of reasonable self-defense or an act in defense of others.

**C.  Section 111(b) - Use of a Dangerous and Deadly Weapon**

1.  This requires B. 1-8 above as charged and
2.  The defendant intentionally and voluntarily used a deadly or dangerous weapon to make physical contact with the officer; and
3.  The defendant's use of the deadly or dangerous weapon was with the intent to cause death or serious bodily injury.

**D.  Definitions**.

**Non-inherently dangerous object**. A non-inherently dangerous object can become a deadly or dangerous weapon if the defendant uses the object in a way and with the intent that is capable of causing serious bodily injury or death to another person.

**A person acts *knowingly*** if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident.

**18 U.S.C. § 1114, Protection of officers and employees of the United States,** lists the persons referred to by Section 1114 as follows:

> (a) IN GENERAL. Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished-III . . .

It is not necessary to show that the Defendant knew the person being forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with was, at that time, assisting a specific federal officer in carrying out an official duty so long as it is established beyond a reasonable doubt that the officer was, in fact, assisting a specific U.S. federal officer, each were lawfully acting, and actions were in the course of official duties.

The defendant **willfully** causes an act to be done if he has the intent to commit the crime charged and then commits the act.

**Forcibly**. Forcibly means by use of force. The adverb "forcibly" applies to each of the verbs listed in section 111(a). The government must show that for any action verb (resists, assaults, et al.) that it was done forcibly. When charged as here, the forcible action of assault must involve actual, intentional, voluntary physical contact with the officer. 1 Modern Federal Jury Instructions-Criminal P 14.01.

**Simple Assault**: An "assault" is an unlawful attempt or offer with force and violence to do injury to the person of another, with such apparent present possibility of carrying out such an attempt as to put the person against whom the attempt was made in fear of personal violence. A threat to use force at some unspecified time in the future does not meet the requirement, nor does intimidating conduct not amounting to a threat. *Id*. See *United States v. Harrison*, 585 F.3d 1155, 1160–61 (9th Cir. 2009) (defendant standing as if he might charge officer was not sufficient by itself to constitute assault). A non-contact assault conviction rarely involves armed police unless the circumstances "involve proof that there was such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." See *United States v. Walker*, *835 F.2d 983 (2d Cir. 1987)(also quoted by the 8th Circuit); also United States v. Streich*, 759 F.2d 579, 582 (7th Cir. 1985), which affirmed a Section 111 conviction where the defendant held a gun in the presence of IRS agents.

## EVIDENCE AND DISCUSSION

By the statute, the victim who was allegedly assaulted must be a United States or federal officer engaged in official duties, or a person specifically assisting a specific U.S. officer.

USCP officers are United States officers. The D.C. MPD and Virginia State police are not United States officers or federal employees; and organizationally neither entity has inherent jurisdictional authority on the U.S. Capitol grounds or inside the U.S. Capitol building. See Civil Disorder *supra* for authority under USCP, 2 USC Section 1961, to police the US Capitol grounds. There was no evidence of any request by the USCP board. The government showed no evidence that MPD officers Sajumon or Morris were assisting a specific USCP officer.[8] The witnesses

---

[8] See *USA v. WILLIAM K. WASHINGTON*, USCA FOR THE THIRD CIRCUIT, No. 21-3299, August 4, 2023, Precedential.

testified that they only saw MPD officers to the right or left and behind them. It was possible that one retreating USCP officer was passed by a witness in the tunnel. Witness officers testified that their sergeants told them to go in "the tunnel." There was no statutory clause presented that allowed for the claim of emergency. This was not 9/11 where buildings fell to the ground upon a violent terrorist attack. At the time Mr. Coffee was present, there were no members of Congress or staffers remaining in the building. Officer Carter Moore stated that he had assisted staffers to leave the building. The timeline the government and Ms. Hawa agreed to was that the Senate and Mr. Pence were out of the main building by 2:20, although Mr. Pence was in the underground concrete garage.

Because no USCP authority to police was authorized, and because the MPD officers were not assisting any specific USCP officer (rather than perhaps the USCP writ large) while they remained under the command and control of their MPD chain of command, the statute does not apply to Mr. Coffee. The VSP were behind the MPD.  Orders were to push protestors out of the tunnel. Mr. Coffee is charged with assaulting MPD Officer Sajumon whose presence on the grounds is under a cloud, who was not a U.S. or federal officer, and was not assisting any USCP officer either directly or indirectly by any evidence.

The government did not show that Mr. Coffee knowingly or willfully assaulted anyone. His testimony  and that of Ms. Graham showed that he was blinded. He pushed forward out of self-defense and defense of others after being assaulted and blinded.  He passed out from lack of oxygen. His movements were based on severe oxidative stress. His actions were reflexive. His intention was in good faith defense. He did not injure anyone. The government failed to show that he used the crutch in  dangerous way meant to inflict serious bodily injury. Mr. Coffee recalls that at one point Officer Sajumon said they "were good."  At most, Officer Sajumon recalled a slight tap on his arm. Such a slight contact that involved crutch to baton push against push was incidental

and de minimus, given the crowded space. The government did not show that Mr. Coffee had any intent to assault.

With no evidence that MPD Officer Sajumon was assisting any USCP officer, and no evidence that Mr. Coffee intended an assault to cause or threaten injury, while the evidence showed that Mr. Coffee attempted to be a peacemaker and stop the violence, the government failed to prove all elements of the crime charged. His affirmative defense of self-defense after not being the initial aggressor, and defense of another, is valid for the incidental contact of pushing after being attacked and blinded. Further, Mr. Coffee's action was not forcible as it did not even cause any imbalance to Officer Sajumon. Instead, Mr. Coffee fell forward and passed out from oxygen deprivation. He had to be assisted out of the tunnel area where it then took at least 45 minutes to clear his eyes. See Graham testimony. He never used the crutch to harm anyone.

### III. The Court Should Acquit on Count Three 18 U.S.C. §§ 111(a)(1) and (b); Assaulting, Resisting, or Impeding Metropolitan Police Officer Morris Using a Dangerous Weapon

The same points related to authority to be on the Capitol grounds and no assistance to any USCP officer which allows this federal charge for assault on a federal officer as presented above for Count Two and Officer Sajumon apply here. Distinguished from the above is that Officer Morris testified that Mr. Coffee did not touch her, did not threaten her, and no pushing of anyone by him caused any contact to her. The government showed no intent for any contact with officer Morris who instead was the aggressor by repeatedly beating Mr. Coffee on his hands and arms. There was no use of any object as a weapon or otherwise here. The charge must be dismissed.

The testimony that the Government deliberately misrepresented in closing was of Officer Lila Morris. She stated absolutely that Mr. Coffee never assaulted her, and that he did not push her. Officer Morris stated that even if she fell backward it was because she was pulled backward

by someone behind her, and the floor was slippery due to the O/C spray. The government in closing falsely stated that Lila Morris did testify that Mr. Coffee assaulted her with contact and pushed her backward by his push with the crutch toward Officer Sajumon. Officer Morris' own body camera video showed officers between her and Mr. Coffee and space where Mr. Coffee could not have made any contact with her.

## IV.   The Court Should Acquit on Count Four 18 U.S.C. § 1752(a)(1) and (b)(1)(A) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

### A.  Section 1752 (a)(1) Elements

1.  The Defendant knowingly entered into a Section 1752 restricted building or grounds

2.  The Defendant did not have lawful authority to enter the restricted building or grounds

3.  The Defendant knew the Vice President was or would be visiting the building.[9]

### B.  Section 1752(b)(1)(A) Enhancement:

1.  The Defendant knowingly used or carried a deadly or dangerous weapon in a Section 1752 restricted building or grounds.

**Abbreviated Legal standard**: the Defendant had to use the non-inherently dangerous object in a way where it could and with the intent to cause serious bodily injury or harm. (See elements of the crimes exhibit). The object's use was in relation to the Section 1752 crime.

### EVIDENCE

### "Restricted Area"

The evidence in this case failed to prove Element 1 and Element 3.  Coffee did not "knowingly" enter into the restricted Capitol grounds, nor did he know that Pence would be

---

[9] See *Elizalde*, 1:23-cr-00170-CJN ECF No. 39 at 4,  Filed 12/01/23  and *Groseclose*, 1:21-cr-00311-CRC Document 99 Filed 01/05/24 as two examples.

visiting.  In his testimony, Coffee denies having any knowledge of the Capitol grounds being restricted or for what purpose they were restricted that day.  Furthermore, none of seven Government witnesses testified that Coffee had the requisite knowledge.

Additionally, the Government showed no evidence that the Defendant knowingly entered into a Section 1752 restricted building or grounds.  The only exhibits the Government has shown related to this point are photos and testimony of how the Capitol grounds appeared *three and a half hours before* Coffee arrived.  Defendant's <u>Exhibit 9</u> shows that all signage was ripped down hours before Mr. Coffee arrived and that, with the mass crowds on the grounds, there were no indications that the grounds were restricted.  Coffee testified that he never once saw any sign or indication that the grounds were closed.  In fact, when he arrived the grounds were wide open and inhabited by thousands—perhaps tens of thousands—of protesters, the majority of which were peacefully assembled and not engaged in violence or unruly behavior.  A reasonable person would not have inferred that they could not be legally present.  Coffee's testimony is also corroborated by witnesses Brady Hall and Lindsay Graham to establish that Coffee did not know the Capitol grounds area were restricted or that it was restricted as a Section 1752 restricted building or grounds.

Furthermore, none of the Government's seven witnesses testified that they believed Coffee had any knowledge that the Capitol grounds were restricted.  They only testified that a restricted area was set up before long the thousands of protesters came, and a riot emerged.

Coffee testified that he saw no dispersal order, notice, warning, or visible sign indicating a restricted area.  The only "barricades" he saw, bike racks he saw were moved and isolated from the points of entry, were not serving as barricades at the time, and not anywhere near their former position that they were in when the day began.  <u>Defendant's Exhibit 61</u> established that

the barricades did not display signs indicating restrictiveness.  No evidence was shown to prove that during the relevant time period of 4pm—4:30pm there existed any visible government effort to remove people from the grounds or telling them to leave the area, except for further back inside the tunnel. No witness testified that they or anyone gave a dispersal order.

Although Coffee testified that he observed a "projectile" being used against a small group of people who had entered deep in the tunnel, he testified that he believed that the area further *within* the tunnel and beyond it to be restricted (meaning closed colloquially), and not the front of the tunnel where he stood.  He further testified that he believed projectiles were only used against people who were engaged in violence, but not the large crowds of people near them.

Coffee's testimony and Brady Hall's testimony established the undisputed fact that his phone battery died, and he did not receive any information about what was happening at the Capitol before he arrived—outside or inside the building. He had no knowledge about the Vice President or that any area had been closed for his protection, as required by the statute. The USCP press release in September 2020 stated that the west side was "restricted" from September 2020 through February 2021 for the build out and tear down of the inaugural stage.

Ms. Hawa insinuated that the area was restricted for Section 1752 protection when not a single email, document, meeting minute, phone call log, or any shred of evidence showed that anyone enacted the area closure for anything besides safety regarding the inaugural stage build out. Ms. Hawa's testimony included that the USSS would be involved with such an outdoor restricted area, yet there was no evidence of anything besides an email stating the Vice President would only be visiting the inside of the building. He was never scheduled to be outside on the west or anywhere, and there was no evidence that the outdoors on the west was restricted for his protection under 1752 purposes. The Section 1752 statute requires that the restricted area be

specifically for a USSS protectee's security. No evidence showed that to be the case - and the statute is being abused. No factual evidence, aside from Ms. Hawa's speculation, was presented by the government to show that any part of the west side of the U.S. Capitol was restricted for purposes of protection of the Vice President. The area was colloquially "closed." With no signage and no announcement, and no knowledge of the Vice President's presence, Mr. Coffee must be acquitted.

### "Deadly or Dangerous Weapon"

The evidence in this case failed to prove that Coffee used the crutch with intent to cause serious bodily injury, or that he used it in a way that was capable of doing so.  All relevant video exhibits show him holding the crutch in a horizontal manner and moving slowly towards the police line.  At no point does the crutch make a sudden or powerful contact with an officer. He did not swing it like an axe. he did not use it like a spear. He did not intentionally touch any officer  in any manner that could cause any injury.

No officer has testified that they were injured by Coffee or even close to being injured. The testimony of Defense witness Steve Hill, in addition to Coffee, established that the crutch was never used in a dangerous way.  Furthermore, Coffee could not see after being blinded by OC spray, and never made direct eye contact with an individual officer, as established by all video exhibits and testimony.

The government failed to provide any evidence that Mr. Coffee used the crutch in relation to entering and remaining on restricted grounds, as required by the law. Mere possession of the object at any time is not the standard. Mr. Coffee did not use the crutch to threaten or strike at anyone so he could gain access to the open Capitol grounds.  See Exhibit Elements of the Section 1752 crime.

**V.   The Court Should Acquit on Count Five 18 U.S.C. § 1752(a)(2) and (b)(1)(A) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**

For Count Five 18 U.S.C. § 1752(a)(2) and (b)(1)(A) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, the Government needed to show:

*First,* the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

*Second,* the defendant did so knowingly, and <u>with the intent to impede or disrupt the orderly conduct of Government business or official functions.</u>

*Third,* the defendant's conduct occurred when, or so <u>that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.</u>

*Fourth*, the defendant knew he was on or close to grounds restricted because he knew of the presence of the Vice President.

**"Disrupt"**

In addition to the points made above concerning "restricted area" and "deadly and dangerous weapon," Count Five should result in an acquittal because the evidence failed to show that Coffee "disrupted" a government function or business. The government provided no evidence that he disrupted the Electoral Count, interfered with any staff work inside the building, or in any way affected the USSS protection of the Vice President, who was secured underground by 2:30 p.m.

The evidence has shown that Coffee went towards the front of the tunnel only to stop the violence breaking out and to help trampled persons who were injured by a near stampede. He was only at the front of the tunnel.

His entry in the first few feet of the tunnel—which only occurred after he was repeatedly pepper-sprayed and could not see—was de minimus.  Additionally, he has trying to bring peace to a violent situation, as established by his testimony and <u>Government Exhibits 401a, 401, and 402,</u>

which show him saying "stop and pray," and later "stop." He made the statements to both the crowd and the police. Creating a clear area between police and rioters, he helped establish an area where Rosanne Boyland, a protester who died at the scene, would receive medical attention and be carried away by police, which occurred shortly thereafter. His defense of a third party was his sole motivation in approaching closer, as demonstrated by his testimony recounting screams and pleas for help.

Furthermore, Coffee did not disrupt official government business. Officer Carter Moore testified that he cleared all staff out of the building before going to the tunnel on his Sergeant's orders around 3:30 pm. There was no government business to disrupt at the time Mr. Coffee was present. Congress had recessed and departed. A small staff presence was escorted out of the building. They left not because of outside protest but because there were protestors inside the building. No evidence was presented that any government business was disrupted by Coffee. Coffee arrived at roughly 4:15pm, as established by all video exhibits. The evidence shows he should be acquitted.

The government failed to show any use of the crutch with an intent to cause serious bodily injury. The government failed to show intentional and willful violence by Mr. Coffee. The government did not show violation of this statute beyond a reasonable doubt.

## VI. Count Six: omitted because the government dismissed the charge at trial

## VII. The Court Should Acquit on Count Seven: 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

In addition to all points made above about concerning "restricted area" and "deadly and dangerous weapon," and lack of an "assault," Count Seven should result in an acquittal because the evidence failed to show that Coffee intentionally engaged in an act of physical

violence. Instead, his was a flailing, reflexive movement caused by the numerous bursts of pepper-spray he received to the face, which soaked his jacket and affected him for 45 minutes.

The evidence has shown that it was not a deliberate act.  Coffee's acts and contact were involuntary, reflexive, and occurred while blinded and disoriented while peacefully trying to help bring peace. In the midst there was reflexive self-defense, with an intent to peacefully defend others from further harm. He initially "stood in the gap" where he protected police against incoming objects and tried to end all violence peacefully before being sprayed to the point of temporary chocking and unconsciousness.

The government failed to show any use of the crutch with an intent to cause serious bodily injury. The government failed to show intentional and willful violence by Mr. Coffee. The government did not show violation of this statute beyond a reasonable doubt.

## VIII.   The Court Should Acquit on Count Eight 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building

All argument relevant to this point has been listed above, particularly in response to Count Five. Mr. Coffee attempted to be a peacemaker and was aggressively attacked.

## IX.   Count Nine omitted due to the government's dismissal of the charge at trial

## X.   The Court Should Acquit on Count Ten 40 U.S.C. § 5104(e)(2)(F), Act of Physical Violence in the Capitol Grounds or Building

In addition to all points made above about concerning "restricted area" and "deadly and dangerous weapon," and lack of an "assault," Count Ten should result in an acquittal because the evidence failed to prove that Coffee *willfully and knowingly* committed violence.

As established by Defendant's Exhibit 27, Coffee was pepper sprayed with an enhanced-grade, high-volume pepper-spray gun and can be seen being hit between 3 times (at least) for an

extended period of time.  Both Agent Hillman and Steve Hill testified that he was pepper-sprayed with a professional spraying device of the larger sort available to police agencies.  He could not see and was debilitated for 45 minutes afterward, as established by the testimony of Defendant's witness Lindsay Graham and Defendant's Exhibits 14(a-d), which show Coffee completely unable to see clearly or even open his eyes after the incident.  Lacking the ability to see or to recognize any figure whatsoever, it cannot be shown beyond a reasonable doubt that Coffee *willfully or knowingly* committed an act of violence.

Furthermore, the slight "push" of the crutch was neither willful nor knowing violence—he was blinded and disoriented, under oxidative stress and acting in a defensive manner, as demonstrated by his downward-facing head at the beginning of the incident (Gov. Exhibit 405). His desire to stop violence was apparent from his initial walk up to talk to the police. For no cause he was assaulted and battered. The government never showed any intent by him to be violent. His self-defense (reflexive) and defense of others did not include any willful violence.

## CONCLUSION

Because the government failed to prove beyond a reasonable doubt all the elements of any crime, Mr. Coffee should be acquitted on every charge. He acted peacefully in good faith with no intent shown for any of the charges.

Wherefore the Court should acquit Mr. Coffee of every count.

Dated February 9, 2024                    Respectfully submitted,

/s/ *Carolyn A. Stewart*                   /s/ ANTHONY F. SABATINI
Carolyn A. Stewart, Bar No. FL-0098        Anthony F. Sabatini
Defense Attorney                           *Attorney for Defendant*  FL Bar No. 1018163
Stewart Country Law PA                     SABATINI LAW FIRM, P.A.
1204 Swilley Rd.                           411 N DONNELLY ST, STE #313
Plant City, FL 33567                       MOUNT DORA, FL 32757
T: (813) 659-5178                          T: (352)-455-2928
E: Carolstewart_esq@protonmail.com         E: anthony@sabatinilegal.com

## CERTIFICATE OF SERVICE

I hereby certify on the 9th day of February 2024, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

                                           /s/ Carolyn Stewart
                                           Carolyn Stewart, Defense Attorney