IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                CR No. 1:21-cr-00327-RC-1

v.
                                        Washington, D.C.
LUKE RUSSELL COFFEE,                    Friday, December 13, 2024
                                        2:00 p.m.

                    Defendant.

- - - - - - - - - - - - - - - - - x

_____

                    TRANSCRIPT OF COURT VERDICT
        HELD BEFORE THE HONORABLE RUDOLPH CONTRERAS
                UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the United States:      Mindy L. Deranek, Esq.
                            U.S. ATTORNEY'S OFFICE FOR THE
                            DISTRICT OF COLUMBIA
                            555 4th Street, NW
                            Washington, DC 20001
                            (202) 252-7776

For the Defendant:          Anthony F. Sabatini, Esq.
                            SABATINI LAW FIRM P.A.
                            411 N. Donnelly Street
                            Suite 3
                            Mount Dora, FL 32757
                            (352) 455-2928

                            Carolyn Stewart, Esq.
                            1204 Swilley Road
                            Plant City, FL 33567
                            (813) 451-5753

Court Reporter:             Timothy R. Miller, RPR, CRR, NJ-CCR
                            Official Court Reporter
                            U.S. Courthouse, Room 6722
                            333 Constitution Avenue, NW
                            Washington, DC 20001
                            (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2                    THE DEPUTY CLERK:  This is Criminal Action 21-327,

3      United States v. Luke Russell Coffee.

4                    Counsel, please approach the podium and state your

5      appearances for the record.

6                    MS. DERANEK:  Good afternoon, Your Honor.

7      Assistant United States Attorney Mindy Deranek for the

8      United States of America.

9                    THE COURT:  Good afternoon.

10                    MR. SABATINI:  Good afternoon, Your Honor.

11      Anthony Sabatini, joined by my co-counsel telephonically for

12      Defendant Luke Coffee.

13                    THE COURT:  Good afternoon.

14                    Good afternoon, Mr. Coffee.

15                    THE DEFENDANT:  Good afternoon.

16                    THE COURT:  Are we ready to get started?

17                    MR. SABATINI:  Yes, Your Honor.

18                    THE COURT:  Okay.  Having considered the evidence

19      presented, I will now render the verdict.

20                    Turning to the facts of this case, the defendant,

21      Luke Coffee, traveled from his home in Texas to Washington,

22      D.C., to film and interview individuals at the Stop the

23      Steal rally that took place on January 6th, 2021.

24                    Following former President Trump's speech at the

25      Ellipse, Mr. Coffee joined the crowd making its way to the

1    Capitol, interviewing various individuals along the way.

2    Once at the Capitol, Mr. Coffee eventually joined the mob

3    that was violently attempting to enter the Capitol building.

4    Mr. Coffee moved to the front of the crowd and up to what is

5    colloquially called the tunnel on the west front of the

6    Capitol.  While at the mouth of the tunnel, Mr. Coffee

7    eventually engaged in an altercation with the officers

8    stationed there, ramming those officers two times with a

9    metallic crutch and then swinging the crutch in the

10   officers' direction.

11          As a result, Mr. Coffee was initially charged by

12   the Government with 10 offenses, though the Government

13   subsequently dropped Counts 6 and 9.  At trial, the

14   Government sought to prove the remaining eight separate

15   offenses, including civil disorder; assaulting MPD Officer

16   Steven Sajumon with a deadly or dangerous weapon; assaulting

17   MPD Officer Lila Morris with a deadly or dangerous weapon;

18   entering and remaining in a restricted building or grounds

19   with a deadly or dangerous weapon; disorderly and disruptive

20   conduct in a restricted building or grounds with a deadly or

21   dangerous weapon; engaging in physical violence in a

22   restricted building or grounds with a deadly or dangerous

23   weapon; disorderly conduct in the Capitol grounds or

24   buildings; and an act of physical violence in the Capitol

25   grounds or buildings.

1    With respect to Count 1, civil disorder, Count 1

2    charges Mr. Coffee with a violation of 18 U.S.C. Section

3    231(a)(3), committing or attempting to commit an act to

4    obstruct, impede, or interfere with law enforcement officers

5    who are lawfully carrying out their official duties incident

6    to a civil disorder, where the civil disorder obstructed,

7    delayed, or adversely affected commerce or the conduct and

8    performance of a federally protected function.

9    In order to find the defendant guilty of this

10   offense, I must find the following three elements beyond a

11   reasonable doubt:

12   First, the defendant knowingly committed an act or

13   attempted to commit an act with the intended purpose of

14   obstructing, impeding, or interfering with one or more law

15   enforcement officers.

16   Second, at the time of the defendant's actual or

17   attempted act, the law enforcement officer or officers were

18   engaged in the lawful performance of their official duties

19   incident to and during a civil disorder.

20   Third, the civil disorder, in any way or degree,

21   obstructed, delayed, or adversely affected either commerce

22   or the movement of any article or commodity in commerce or

23   the conduct or performance of any federally protected

24   function.

25   To begin with, I find beyond a reasonable doubt

1    that Mr. Coffee knowingly committed an act with the intended

2    purpose of obstructing, impeding, and interfering with one

3    or more law enforcement officers.  As visible in

4    Government's Exhibits 302 and 303, Mr. Coffee forcefully

5    shoved police officers further into the tunnel two times

6    using a metallic crutch.  Those shoves pushed officers back

7    and temporarily prevented those officers from clearing the

8    tunnel and further allowed other rioters ingress into the

9    tunnel area.  After ramming into the officers twice,

10   Mr. Coffee then swung the crutch in the officers' direction.

11   Mr. Coffee's participation in this effort is best captured

12   in Exhibit-405 from timestamp 0:14 through 40, a video taken

13   by an individual in the crowd.  This conduct can only be

14   described as an act of interference with those officers'

15   duties.  And there is no question that this effort did, in

16   fact, interfere with these officers' ability to perform

17   their duties in the tunnel.  Officers Sajumon and Morris

18   described in detail how the force of the push made it more

19   difficult for them and their fellow officers to do their

20   job.  This can be found in their testimony on day one of the

21   trial at Pages 152 through 53, 155 through 56, and 206

22   through 207.

23            I also find that Mr. Coffee committed those acts

24   knowingly; meaning, that he realized what he was doing, was

25   aware of the nature of his conduct, and did not act through

1    ignorance, mistake, or accident.  The videos show Mr. Coffee

2    collecting himself, lowering the crutch to hold it

3    horizontally in front of himself, and then running forward

4    to press the crutch against the officers who were attempting

5    to clear the tunnel of rioters.  This can be seen at

6    Exhibit-405 at Timestamp 0:00 through 17.  Mr. Coffee

7    continued to push the officers for roughly 20 seconds until

8    he slipped.  This can be seen in Exhibit-303 at Timestamp

9    16:24:45 through 48.  The video then shows Mr. Coffee regain

10   his feet before bracing himself and aggressively charging

11   into the line of officers once more.  Same exhibit at

12   Timestamp 16:24:51.  That is not the body language of

13   someone acting reflexively or by mistake.  Mr. Coffee could

14   have retreated but instead escalated the violence in the

15   tunnel; therefore, I do not credit Mr. Coffee's argument

16   that his conduct was a result of reflex.

17          Nor does the evidence support that Mr. Coffee's

18   actions were self-defense or defense of another, as the

19   defense would like the Court to believe.  An individual has

20   the right to use a reasonable amount of force in defense of

21   self or another person if, one, he actually believes that

22   there is imminent danger or bodily harm and if, two, he has

23   reasonable grounds for that belief.  But the use of force

24   must also be no more than reasonably necessary to prevent

25   the imminent danger.  This can be found in *United States v.*

1    *Dixon*, 548 U.S. 1, pincite 13 through 14, 2006; and in this

2    Circuit, *Abigail Alliance for Better Access to Developmental*

3    *Drugs v. Von Eschenbach*, 495 F.3d 695, pincite 709, D.C.

4    Circuit 2007.

5          Here, Mr. Coffee's force was not necessary or

6    reasonable for self-defense.  Mr. Coffee could have

7    protected himself just as well from the OC spray or being

8    hit by a stick swung by an officer by retreating down the

9    steps and away from the Capitol.  Instead, he continued

10   forward toward the officers who were spraying him.

11         And Mr. Coffee's use of force was not reasonable

12   or necessary with respect to defending any other individual.

13   The individual Mr. Coffee argues that he was defending,

14   which now has been identified as Rosanne Boyland, was laying

15   on the steps in front of the tunnel.  This is Day 3 of the

16   trial transcript at Pages 670 through 71 and Page 757.  The

17   video footage evidence introduced at trial does not show

18   that Mr. Coffee was attempting to assist that individual or

19   that he had any concern for that individual while he was at

20   the entrance to the tunnel ramming into the police line.

21   The video evidence of Government's Exhibit-304 shows that

22   even when Mr. Coffee bent down to pick up the crutch,

23   Ms. Boyland was right by his foot and a downed officer was

24   on his other side.  But Mr. Coffee did not render aid or

25   make any attempt to do so to either one.  And this was --

1    can be found in Day 3 of the trial transcript at Page 761

2    and Day 4 of the trial transcript at Pages 825 through 26.

3    Nor did he attempt to alert the officers to the presence of

4    an individual on the ground.  This is Day 4 of the trial

5    transcript at 839.  Mr. Coffee did not stop to render aid,

6    despite the -- in his own estimation -- three minutes he

7    spent at the top of the steps near the tunnel entrance.

8    This is Day 4 of the trial transcript at 813.

9           If anything, Mr. Coffee's conduct made the

10   situation more volatile and dangerous for others in the

11   tunnel.  And, in fact, the video evidence in Government's

12   Exhibits 302 and 303 show that other rioters moved

13   Ms. Boyland out of the tunnel area seconds before Mr. Coffee

14   charged the officers in the tunnel, thus highlighting that

15   his attacks on the officers in the tunnel was not reasonable

16   or necessary with respect to defending Ms. Boyland who, by

17   that time, was out of the tunnel and off to the side well

18   out of harm's way.

19          I, therefore, find that Mr. Coffee did not attack

20   the officers in self-defense or defense of another.  While

21   Mr. Coffee may have initially climbed the steps to the

22   tunnel to observe -- and perhaps even to assist individuals

23   who needed help -- that does not change the fact that he

24   later chose to ram into the officers who were protecting the

25   tunnel instead of helping any individuals in or around the

1    tunnel.

2         The first element also requires a finding of the

3    defendant's specific intent to obstruct, impede, or

4    interfere with the law enforcement officers.  This, too, has

5    been satisfied beyond a reasonable doubt.  Mr. Coffee's

6    intent is apparent from his actions depicted on video.

7    After standing at the mouth of the tunnel for some time, he

8    knew where the line of officers was located and rammed into

9    them twice, shoving them back into the tunnel.  This is best

10   demonstrated in Exhibit-303 at Timestamp 16:28:24 through

11   54.  It is apparent that by holding the officers back,

12   Mr. Coffee would obstruct, impede, or interfere with the

13   officers who were doing their job removing rioters from the

14   tunnel.

15        If Mr. Coffee's goal was simply to retreat or

16   defend himself after being sprayed with OC spray, charging

17   the line of officers with a horizontal crutch would have

18   been a highly illogical choice.  And I do not find it

19   credible that Mr. Coffee's decision to ram into the officers

20   was reflexive.  As previously stated, before he charged,

21   Mr. Coffee deliberately lowered the crutch in front of

22   himself, and his first shove held officers back for

23   approximately 20 seconds.  This is best demonstrated in

24   Exhibit-405 at Timestamp 0:15 through 40.  And after falling

25   and then regaining his feet, Mr. Coffee decided to

1    aggressively rush forward a second time.  This is best seen

2    at Exhibit-303 at Timestamp 16:28:51 through 55.  And after

3    being rebuffed a second time, Mr. Coffee swung the crutch in

4    the direction of the officers.  Same exhibit at Timestamp

5    16:28:55 through 57.  All this leads to finding beyond a

6    reasonable doubt that Mr. Coffee had the specific intent to

7    interfere with and impede the officers themselves.  The law

8    permits a fact finder to infer that a person intends the

9    natural and probable consequences of his actions, and the

10   natural and probable consequences of Mr. Coffee's actions

11   was to interfere with and impede the officers in the tunnel.

12            As for the second element, the officers that

13   Mr. Coffee interfered with were engaged in the lawful

14   performance of their official duties incident to and during

15   a civil disorder.  As the law enforcement officers

16   testified, they had responded to the scene at the lower west

17   terrace as a result of the public disturbance taking place

18   there.

19            The evidence at trial showed that the Capitol

20   Police and MPD officers guarding the mouth of the tunnel had

21   been deployed to defend the Capitol from the riotous crowd

22   of which Mr. Coffee was a member.  In doing so, they were

23   fulfilling their obligation to protect the Congresspeople

24   who, at that point, had been forced to shelter inside the

25   building.  Because the Capitol Police were unable to defend

1   the building and those inside by themselves, they had

2   requested MPD's assistance as well as the assistance of

3   other law enforcement agencies in the area.

4           Officer Rani Brooks, a member of one of the

5   Capitol Police's disturbance unit platoons, testified that,

6   together, the Capitol Police and MPD worked to prevent the

7   Capitol from being breached.  This can be found in Day 1 of

8   the trial transcript at Pages 115 through 16, 122 through

9   23, and 135.  Officer Steven Sajumon, who served as an MPD

10  officer, testified similarly.  This can be found at Day 1 of

11  the trial transcript at 145, 171, 182 through 83.

12          At the time of Mr. Coffee's relevant acts, Officer

13  Sajumon was stationed inside the tunnel.  He testified that

14  at that point in the afternoon, his mission and the mission

15  of those officers stationed with him in the tunnel was

16  simply to secure that entrance to the Capitol.  This can be

17  found at Day 1 of the trial transcript at Page 145, Officer

18  Sajumon testifying "after we were done escorting

19  individuals, the Capitol Police officer told us we needed to

20  go to the tunnel, to secure the tunnel, to prevent rioters

21  from coming in."

22          And then at Day 1, trial transcript at 171,

23  Officer Sajumon testified "When we arrived, there was one

24  Capitol Police officer that guided us on where to go because

25  we're not familiar with the Capitol building."

1    And then further on at Day 1, trial transcript at

2    111, Officer Brooks answered "Yes" when asked "Did the

3    Capitol Police have to ask for help from other law

4    enforcement agencies to help secure and protect the

5    building?"  When she was asked "who responded," she answered

6    "the Metropolitan Police Department."

7    Further on at Page 122, when Officer Brooks was

8    asked whether MPD officers were there to help Capitol Police

9    in securing the Capitol, she answered "Yes, they were."

10    And further on at Page 123, when Officer Brooks

11    was asked the question "And were there both MPD and Capitol

12    Police officers in the tunnel as part of this push?" she

13    answered "Yes.  We were there together."

14    And at Page 126, Officer Brooks stated that she

15    was in the tunnel and identified Capitol Police Sergeant

16    Aquilino Gonell in the tunnel in Video Exhibit-205B.

17    At Day 2 of the trial transcript at Page 350, MPD

18    Officer Carter Moore testified "We were greeted by a U.S.

19    Capitol Police officer who led us into the tunnels that run

20    underneath the Capitol."

21    The defense contends that the D.C. Metropolitan

22    Police officers in the tunnel were not engaged in the lawful

23    performance of their duties.  This is so, the defense

24    argues, because those officers were not at the Capitol,

25    quote, "upon the request of the Capitol Police Board,"

1    closed quote, and the presence of MPD officers at the

2    Capitol was only lawful if they were assisting U.S. Capitol

3    Police.  Of the hundreds of January 6th cases brought in

4    this district, defendant has not cited a single judge to

5    have ruled this way.  In fact, defendant has not cited a

6    single instance in which a court seriously considered this

7    argument.

8         Regardless, I disagree with the defense's

9    contention.  While the defense points to Title 2 U.S.C.

10   Section 1961 for the proposition that the MPD is only

11   authorized to perform their duties within the Capitol

12   grounds upon the request of the Capitol Police Board, this

13   statute is not so limiting.  Rather, 2 U.S.C. 1961

14   authorizes the MPD to perform their duties on Capitol

15   grounds with the exception that MPD may not enter the

16   Capitol in response to complaints, to serve warrants, or to

17   patrol.

18        On January 6th, MPD were at the Capitol to assist

19   Capitol Police at the Capitol Police's request and were

20   lawfully engaged in the lawful performance of those duties.

21   As the Circuit indicated in *Dellums v. Powell*, 566 F.2d 216,

22   Pincite 222 at Note 19, D.C. Circuit 1977, the Circuit

23   stated the legislative history indicates that Congress

24   intended to allow the Metropolitan Police to make arrests on

25   the Capitol grounds when they were in pursuit of an offender

1    and when they were asked to patrol on the grounds, but not

2    when acting on complaint or warrant.  I, therefore, conclude

3    that the law enforcement officers from the MPD were lawfully

4    engaged in their lawful duties.

5         There is no doubt that the officers performed

6    their duties incident to and during a civil disorder.  The

7    term "civil disorder" is defined as any public disturbance

8    involving acts of violence by groups of three or more

9    persons which, A, causes an immediate danger of injury to

10   another individual; B, causes an immediate danger of damage

11   to another individual's property; C, results in injury to

12   another individual; or, D, results in damage to another

13   individual's property.

14        The mountain of video and photographic evidence

15   showing the violent acts of hundreds of rioters that day and

16   in the specific location -- including scaling walls,

17   throwing objects, breaking windows, and forcing through

18   doors -- leaves no doubt as to this particular element.

19   This is primarily demonstrated by Exhibit-201, which is the

20   montage with the crypt break-in at Timestamp 3:00 through

21   4:30; Exhibit-202, which was the west front time lapse; and

22   Exhibit-405 at 18 through 22 demonstrating rioters throwing

23   objects.

24        The defense further moves for a judgment of

25   acquittal on Count 1 because the defense argues the civil

15

1    disorder had no link to commerce.  The term "commerce" means

2    commerce or travel between one state, including the District

3    of Columbia, and any other state, including the District of

4    Columbia.  It also means commerce wholly within the District

5    of Columbia.  The Government did, however, enter evidence

6    that the Capitol riot impacted commerce by necessitating the

7    closure of Safeway stores throughout the District.  Agent

8    Hillman testified that the riot prompted a lockdown that

9    required Safeway stores in Washington, D.C. to close.  And

10   this can be found at Day 1 of the trial transcript at 248.

11   And Exhibit-703 is an email sent to Safeway store managers

12   instructing them to close at 4:00 p.m. that day.

13   Exhibit-702 additionally shows the drop in sales Safeway

14   experienced on January 6, 2021, compared to the previous

15   year.  Agent Hillman discusses these reports in Day 2 of the

16   trial transcript at Pages 289 through 90.

17          While I find that the civil disorder did have a

18   link to commerce, I need not even wade into this argument

19   because there are two prongs to Section 231(a)(3): the

20   interstate commerce prong and the federally protected

21   function prong.  The full statutory text of 18 U.S.C.

22   231(a)(3) reads:  "Whoever commits or attempts to commit any

23   act to obstruct, impede, or interfere with any fireman or

24   law enforcement officer lawfully engaged in the lawful

25   performance of his official duties incident to and during

1   the commission of a civil disorder which, in any way or

2   degree, obstructs, delays, or adversely affects commerce or

3   the movement of any article or commodity in commerce or the

4   conduct or performance of any federally protected function

5   shall be fined under this title or imprisoned not more than

6   five years or both."

7           The plain text of that statute uses the

8   disjunctive "or" throughout.  Other courts in this district

9   that have addressed challenges to Section 231(a)(3) have

10  found that either prong is sufficient to sustain a

11  conviction.  Those examples include *United States v.*

12  *Gossjankowski*, the cite 2023 WL 130817 at Page 14.  That's a

13  District Court of D.C. case, January 9, 2023, which held

14  that a charge under Section 231(a)(3) could be sustained

15  based on the "federally protected function" prong.  This

16  also can be found in *United States v. Mostofsky*, cite 2021

17  WL 6049891 at Page 3.  That's also a District of Columbia

18  District Court case, December 21, 2021.  And in that case,

19  the court found that Section 231(a)(3) was permissible under

20  the Commerce Clause and suggested that the "federally

21  protected function" prong could be an alternate route to

22  conviction.  And that's also found in *United States v.*

23  *Sargent*, 2022 WL 1124817 at Page 4.  That's also a D.C.

24  District Court case, April 14th, 2022, which held similarly.

25          I find beyond a reasonable doubt that the civil

disorder on the grounds of the U.S. Capitol and in the

Capitol building on January 6th, 2021, in which Mr. Coffee

took part, adversely affected a federally protected function

as that term is used in Section 231(a)(3).  The term

"federally protected function" means any function,

operation, or action carried out under the laws of the

United States by any department, agency, or instrumentality

of the United States or by an officer or employee thereof.

The "department" includes executive departments, one of

which is the Department of Homeland Security of which the

Secret Service is a part.  As I and other judges in this

district have previously concluded, the Secret Service's

statutorily prescribed responsibility to protect the vice

president during the joint session of Congress on January

6th, 2021, counts as a function carried out under the laws

of the United States.  And this can be found in *U.S. v.*

*Nordean*, 2021 WL 6134595 at Page 15.  That was a December

28, 2021 opinion of this District Court; and *Gossjankowski*,

a cite I've already given, at Page 14.

         The credible testimony of Secret Service Agent

Lanelle Hawa made clear that the civil disorder interfered

with the Secret Service's function of protecting Vice

President Pence on January 6th.  This can be found at Day 1

of the trial transcript at Pages 55 through 58.  The vice

president was evacuated to a secure location and was forced

1    to remain there rather than being able to evacuate the

2    building because of the rioters, including Mr. Coffee, who

3    had breached the perimeter.  Hawa credibly testified that

4    the vice president's safety was jeopardized as soon as the

5    perimeter was breached and that they could not move him

6    until the grounds were clear.  Mr. Coffee may have only

7    played a small part in the civil disorder that day, but he

8    was an active participant whose presence and violent

9    interference with law enforcement officers escalated the

10   circumstances and prolonged the interference with the Secret

11   Service's ability to protect the vice president.

12          Accordingly, the Government has proven all three

13   elements of civil disorder beyond a reasonable doubt and I,

14   therefore, find Mr. Coffee guilty as charged in Count 1.

15          I move on to Counts 2 and 3 which are both

16   assaulting, resisting, or impeding certain officers.

17          Counts 2 and 3 charge the defendant with forcibly

18   assaulting, resisting, opposing, impeding, intimidating, or

19   interfering with a person assisting a federal officer while

20   the federal officer was engaged in the performance of his or

21   her official duties, in violation of 18 U.S.C. Section

22   111(a)(1) and (b).

23          Count 2 relates to Officer Steven Sajumon of the

24   Metropolitan Police Department and Count 3 relates to

25   Officer Lila Morris of the Metropolitan Police Department.

1          The elements of this offense are, first, the

2     defendant assaulted, resisted, opposed, impeded,

3     intimidated, or interfered with the officer or officers

4     described in the indictment.

5          Second, the defendant did such act forcibly.

6          Third, the defendant did such act intentionally.

7          Fourth, the person assaulted, resisted, opposed,

8     impeded, intimidated, or interfered with was assisting an

9     officer or an employee of the United States who was then

10    engaged in the performance of his official duties, or any

11    person assisting such an officer or employee in the

12    performance of that officer's duties.

13         And, fifth, the defendant used a deadly or

14    dangerous weapon or inflicted bodily injury.

15         For the lesser included offense, I need not find

16    the use of a deadly or dangerous weapon or infliction of

17    bodily injury and instead must find beyond a reasonable

18    doubt that either the defendant made physical contact with

19    the federal officer or acted with the intent to commit

20    another felony.

21         With respect to Count 2, Officer Sajumon -- as

22    established by his credible testimony, Officer Steven

23    Sajumon is a member of the D.C. Metropolitan Police

24    Department who responded to the Capitol on January 6th,

25    2021.  This can be found at Day 1 of the trial transcript at

142 through 44.  He responded to the west terrace and was present alongside other officers of the MPD and Capitol Police in the tunnel when Mr. Coffee reached that area.

As can be seen in Officer Sajumon's body camera footage, Government's Exhibit-303 at Timestamp 16:28:23, Mr. Coffee lowers a metallic crutch in front of himself horizontally and shoves forward into a group of officers, pressing them together and blocking the tunnel.  The video shows Coffee pressing against officers for approximately 20 seconds before slipping onto the ground.  After regaining his feet, at approximately Timestamp 16:28:50, Mr. Coffee rushed at the officers a second time, slamming into Officer Sajumon in particular and then subsequently swinging the crutch in Officer Sajumon's direction.  Mr. Coffee is clearly identifiable in the video footage and there is no reasonable doubt that he rammed into Officer Sajumon and swung the crutch at him.  The same moment of the charge is visible from different angles in Government's Exhibits 405 and 302.  Mr. Coffee himself testified that he put his whole body into the push and that he acted as if he, quote, "was carrying a football and trying to drive through the line." This can be found at Day 4 of the trial transcript at 834.

I, therefore, find beyond a reasonable doubt that Mr. Coffee rammed into the MPD officers, including Officer Sajumon, with a metallic crutch.

1          Mr. Coffee's action, shoving the officers with the

2     crutch, as Officer Sajumon credibly testified, impeded MPD's

3     ability to defend the Capitol.  While it is not clear that

4     he intended to assault, oppose, or interfere with Officer

5     Sajumon specifically since he rushed all of the officers

6     immediately in front of him in the police line at the

7     tunnel, Mr. Coffee nevertheless intended to oppose, impede,

8     intimidate, and interfere with the officers in front of him,

9     including Officer Sajumon, and achieved that end within the

10     ordinary meaning of those words by ramming into Officer

11     Sajumon.  That conduct both impeded and interfered with

12     Officer Sajumon's activities protecting the Capitol.

13          There's also no reasonable doubt that the ramming

14     was an act that used force against Officer Sajumon and thus

15     that Mr. Coffee acted forcibly.  This is as defined in

16     *United States v. Klein*, 533 F. Supp. 3d, Page 1, Pincite 10,

17     D.D.C. 2021, in which the court held that a defendant who

18     acts forcibly using a deadly or dangerous weapon under

19     111(b) must have used force by making physical contact with

20     the federal officer or at least threatened the officer with

21     an object that, as used, is capable of causing great bodily

22     harm.  I have no difficulty finding that the crutch

23     Mr. Coffee used made physical contact with the victim,

24     Officer Sajumon, as described in his testimony and as

25     visible on the videos.  Thus, the defendant acted forcibly.

1        Next, I determine that Mr. Coffee rammed the
2   officers, including Officer Sajumon, intentionally.  As the
3   video shows, he rammed the officers after deliberately
4   lowering the crutch, collecting himself, and aiming for the
5   officers.  He pressed against the officers for roughly 20
6   seconds, fell, and then got up and rammed against the
7   officers again, this time ramming into Officer Sajumon
8   directly.  And afterwards, Mr. Coffee chose to swing the
9   crutch in Officer Sajumon's direction.  It is clear that
10  Mr. Coffee intended to assault the line of officers because
11  it was a virtual certainty that by ramming forward into the
12  line of officers, he would hit one of them and potentially
13  injure them.  There is no credible testimony or video
14  evidence that these acts were reflexive or unintentional.
15  Although video evidence does show that Mr. Coffee was hit by
16  chemical spray, the video evidence does not show that it
17  made any less -- that it made it any less deliberate until
18  after he made his attacks and fell back into the crowd.  To
19  the contrary, the video shows that despite being hit with OC
20  spray while wearing glasses at least partially protecting
21  his eyes, Mr. Coffee had the vision and presence of mind to
22  reach down, see the crutch on the ground, pick it up, hold
23  it above his head, and then use it as a weapon as he charged
24  the police line.  Even after falling down and being lifted
25  up by others, he had the presence of mind to charge forward,

1    not wildly, but directly into the line of officers.  This

2    demonstrates intentional conduct.

3          And the evidence shows beyond a reasonable doubt

4    that Mr. Coffee's intent was to inflict injury.  He did not

5    push forward in a way that attempted to maneuver through the

6    officers or turn around.  Instead, he rammed the officers in

7    an apparent attempt to increase the amount of physical

8    contact and force applied against the officers.  Thus,

9    Mr. Coffee had the clear intent to assault, oppose, impede,

10   and interfere with the officers in his vicinity since he

11   rammed directly into where the officers were defending the

12   tunnel.

13         With respect to the fourth element, the defense

14   argues that the MPD officers in the tunnel, including

15   Officer Sajumon, were not assisting the U.S. Capitol Police

16   or any U.S. Capitol Police officer and that, therefore, the

17   defense says, the Government has not satisfied the fourth

18   element of this count.  I find that the facts in this case

19   show the opposite.  As several MPD officers testified and as

20   shown in video footage introduced into evidence, there was

21   at least one other Capitol Police officer in the tunnel with

22   Officer Sajumon, and Officer Sajumon was assisting that

23   officer as well as the other U.S. Capitol Police officers at

24   the Capitol by removing rioters from the tunnel.  I've

25   already gone over some of that testimony.  But it's

1    demonstrated in the video as well in Exhibit-303 at

2    Timestamp 16:23:02.

3              Moreover, Captain Rani Brooks of the Capitol

4    Police, who was serving as a lieutenant for the Capitol

5    Police on January 6th, 2021, credibly testified that the

6    Capitol Police requested assistance from the MPD on January

7    6th and that the Capitol Police specifically requested

8    assistance on the west front of the Capitol where Mr. Coffee

9    was located.  This can be found at Day 1 of the trial

10   transcript at 111.  Captain Brooks specifically --

11   Lieutenant or Captain Brooks specifically testified about a

12   conversation between Brooks and an MPD Commander about the

13   MPD's assistance to the Capitol Police in removing rioters

14   from the tunnel and the west front.  This can be found at

15   Day 1 of the trial transcript at 121 through 22.  Moreover,

16   Officer Sajumon credibly testified that a Capitol Police

17   officer told him that the Capitol Police needed assistance

18   securing the tunnel and preventing rioters from entering

19   through the Capitol building through the tunnel.  This can

20   be found at Day 1 of the trial transcript at 145.  Thus, I

21   find beyond a reasonable doubt that Officer Sajumon was

22   assisting an officer or employee of the United States, the

23   Capitol Police officers, who were engaged in the performance

24   of their official duties at the time.

25             I also find that Mr. Coffee's conduct was an

1    assault and made physical contact with Officer Sajumon.

2    Mr. Coffee's conduct -- ramming Officer Sajumon and swinging

3    the crutch at him -- is an assault because it was an attempt

4    or threat to inflict injury, coupled with the present

5    ability to do so.  The term "assault" is technical and means

6    any intentional attempt or threat to inflict injury upon

7    someone else when coupled with an apparent present ability

8    to do so.  There is no real doubt that Mr. Coffee had the

9    present ability to inflict injury.  Although the defense

10   claims that it was only meant to counter the officers' force

11   or that it was reflexive, the evidence does not support that

12   claim and it, at a minimum, threatened to inflict injury.

13   Relatedly, I find beyond a reasonable doubt that Mr. Coffee

14   made physical contact with Officer Sajumon when he rammed

15   into him.  This conduct, at a minimum, falls within the

16   actions listed in Section 111(a)(1).

17        Mr. Coffee presents "defense of another" and

18   "defense of self" defenses for his action.  I've already

19   covered much of this, but to recap, every person has the

20   right to use a reasonable amount of force in defense of

21   another person if he actually believes that the other person

22   is in imminent danger of bodily harm, he has reasonable

23   grounds for that belief, and the force used is no more than

24   reasonably necessary.  But as I explained when discussing

25   Count 1, the video footage makes it clear to me that

1    Mr. Coffee was not acting in defense of self or in defense

2    of another.

3              Finally, I must consider for Count 2 whether the

4    crutch was a dangerous or deadly weapon.  I find that, as

5    used by Mr. Coffee, it was.  A deadly or dangerous weapon is

6    any object which, as used or attempted to be used, may

7    endanger the life of or inflict serious bodily injury harm

8    on a person.  This is set forth in *U.S. v. Easterday*, 2024

9    WL 1513527 at Page 4.  That's a District Court case, April

10   8, 2024, discussing *U.S. v. Arrington*, 309 F.3d 40, D.C.

11   Circuit 2002.  The crutch, which was a long piece of

12   lightweight metal with a grip in the middle, was capable of

13   inflicting great bodily harm as defined in the statute and

14   in the case law interpreting it.  When used as a tool to ram

15   officers, the crutch has potential to harm a person.  And

16   indeed, it can even harm officers wearing protective gear.

17   This is demonstrated in *U.S. v. McCaughey*, M-C capital

18   C-A-U-G-H-E-Y, Case No. 21-cr-40, ECF No. 638 at 23 in which

19   the court found a police shield is a dangerous weapon

20   capable of causing bodily injury or death when the defendant

21   used it in this manner causing an officer significant pain,

22   specifically in his lungs, his head and his face, when used

23   to crush him and its hard surface prevented him from

24   fighting against the assault.  Similarly, *United States v.*

25   *Padilla*, 538 F. Supp. 3d, Page 32, Pincite 42, D.D.C. 2021,

1  the same analysis for a metal sign used to ram officers; and

2  *United States v. McHugh*, 2023 WL 2384444 at Page 5, D.D.C.

3  March 6, 2023, the same analysis used concerning a sign used

4  to push officers.  The crutch was used with enough force

5  that Officer Sajumon testified that he felt threatened by

6  Coffee's assault with the crutch, given that it could have

7  knocked him unconscious or broken his arm.  And his

8  testimony can be found at Day 1 of the trial transcript at

9  155 through 57 which testimony I find credible.  Thus, the

10  Court finds beyond a reasonable doubt that the crutch, as

11  used by the defendant, was a deadly or dangerous weapon.

12       Accordingly, I find Mr. Coffee guilty beyond a

13  reasonable doubt of assaulting Officer Sajumon with a

14  dangerous or deadly weapon, as charged in the Count 2.

15       I move on to Count 3 which is the count involving

16  Officer Morris.

17       In addition to charging Mr. Coffee with the

18  actions related to Officer Sajumon, the Government also

19  charged Mr. Coffee with assaulting, impeding, and

20  interfering with Officer Morris, in violation of 18 U.S.C.

21  Section 111(a)(1) and (b).  The conduct for this count is

22  largely the same as the conduct for the count for assaulting

23  Officer Sajumon but is focused on the first part of the

24  charge with the horizontally-held crutch before Mr. Coffee

25  fell down and directed his actions towards the direction of

1    Officer Sajumon.

2            To begin with, Mr. Coffee assaulted, impeded, and

3    interfered with Officer Morris when he shoved the officers

4    in the tunnel, pushing Officer Morris further back into the

5    tunnel.  As established by her credible testimony, Officer

6    Morris was assaulted, impeded, and interfered with because

7    she could not continue to move forward and clear rioters

8    from the tunnel and the crush of Mr. Coffee's ramming made

9    it difficult for Officer Morris to breathe.  Her testimony

10   can be found at Day 1 of the trial transcript at Pages 203

11   through 04.

12           The Court also finds that Mr. Coffee's actions

13   were forcible.  This is so because, at the very least,

14   Mr. Coffee threatened Officer Morris by applying force with

15   the crutch and ramming it against the line of officers.

16   Indeed, Officer Morris credibly testified that the crush of

17   individuals shoved by Mr. Coffee made it difficult for her

18   to breathe.  There's no doubt that shoving someone with a

19   metallic crutch is a forcible act.

20           Mr. Coffee's charge also shows a purposeful intent

21   to assault, impede, and interfere with officers and was

22   calculated to make contact with those officers, including

23   Officer Morris.  Given the context and the calculated aim

24   with which Mr. Coffee charged into the officers with a

25   horizontally-held crutch amplifying the impact of the

1    charge, I find that he acted with the intent to cause bodily

2    injury and indeed the specific intent to assault, impede,

3    and interfere with Officer Morris.  As previously stated,

4    the law permits a fact finder to infer that a person intends

5    the natural and probable consequences of their actions.  The

6    natural consequences of Mr. Coffee plowing into the police

7    line with a horizontally-held crutch is that it will

8    assault, impede, and interfere with the officers to which

9    the charge is directed.

10    Officer Morris is a member of MPD who responded to

11    the west terrace and was present and alongside other

12    officers of the MPD and Capitol Police in the tunnel when

13    Mr. Coffee first reached that area.  This can be found in

14    Day 1 of the trial transcript at Page 187 through 89 as well

15    as 204 through 05.  Thus, the fourth element of the charge

16    is established in that the person assaulted, impeded, and

17    interfered with -- Officer Morris -- was assisting an

18    officer or employee of the United States engaged in the

19    performance of their official duties.

20    Additionally, as I explained previously, I find

21    that the crutch -- as used to ram the officers in the

22    tunnel -- constitutes a deadly or dangerous weapon.  As

23    previously set forth, the video evidence shows that

24    Mr. Coffee charged and pressed against the officers for

25    about 20 seconds and Officer Morris testified that it made

1    it hard for her to breathe.  This can be seen at Exhibit-405

2    from Timestamp 0:14 through 40.  Accordingly, I find

3    Mr. Coffee guilty beyond a reasonable doubt of assaulting

4    Officer Morris with a deadly or dangerous weapon, as charged

5    in Count 2.  Moreover, as set forth with respect to Count 1

6    and the charge involving Officer Sajumon, Mr. Coffee's

7    actions were not justified in defense of himself or others.

8             Although I need not reach the elements of the

9    lesser included offense, I will also say that I find the

10   Government also proved the elements of that offense.

11   Mr. Coffee assaulted, impeded, and interfered with Officer

12   Morris and I find that Mr. Coffee committed these acts with

13   the intent to commit another felony.  As I explained when

14   discussing Count 1, Mr. Coffee had the intent necessary to

15   commit the civil disorder felony charge.  And he assaulted,

16   impeded, and interfered with Officer Morris with the intent

17   to commit that felony.  That is enough to find Coffee guilty

18   of a violation of Section 111(a) as set forth in U.S. v.

19   McCaughey, Case No. 21-cr-40, ECF No. 751 at Page 22.

20            Accordingly, I find Mr. Coffee guilty beyond a

21   reasonable doubt of Count 2 involving Officer Sajumon and

22   Count 3 involving Officer Morris.

23            I move on to Count 4, entering and remaining in a

24   restricted building or grounds.

25            Count 4 charges Mr. Coffee with entering or

remaining in a restricted building or grounds, in violation

of 18 U.S.C. Section 1752(a)(1) and (b)(1)(A).  In order to

find the defendant guilty of this offense, I must find that

the Government proved each of the following elements beyond

a reasonable doubt:

First, that the defendant entered or remained in a

restricted building or grounds without lawful authority to

do so.

Second, that the defendant did so knowingly.

Third, that the defendant knowingly used or

carried a deadly or dangerous weapon during and in relation

to the offense.

For the lesser included offense, the Court need

not find the third element.

For purposes of this offense, the term "restricted

building or grounds" means any posted, cordoned off, or

otherwise restricted area of a building or grounds where a

person protected by the Secret Service is or will be

temporarily visiting.  The term "person protected by the

Secret Service" includes the vice president and the

immediate family of the vice president.

With respect to the first element of this offense,

I find that the entrance to the tunnel, at the very least,

was in a restricted area and that Mr. Coffee entered and

remained in the restricted area without lawful authority to

1   do so.  As Secret Service Agent Hawa testified -- and as

2   corroborated by MPD Officer Rani Brooks -- the Capitol

3   building and the area immediately surrounding the Capitol

4   building were restricted on January 6th.  And this can be

5   found in Day 1 of the trial transcript at Page 51 and at

6   Page 109 through 10.  That meant that only those individuals

7   authorized to be at the Capitol, such as individuals working

8   at the Capitol, Hill staffers, and Capitol Police officers,

9   were permitted in the area on that day.  In other words, the

10  general public was not authorized to enter the restricted

11  area.  The tunnel, which is an entrance into the Capitol

12  building, is clearly within the restricted area.  It is

13  confirmed through ample video footage that Mr. Coffee

14  entered and, for some time, remained in the restricted area.

15  This is best set forth in Government's Exhibits 302 and 303.

16  Accordingly, I find beyond a reasonable doubt that the first

17  element is satisfied.

18         The question then becomes whether he did so

19  knowingly.  As with Count 1, a person acts knowingly if he

20  realizes what he is doing and is aware of the nature of his

21  conduct and does not act through ignorance, mistake, or

22  accident.  Although many of the barriers around the Capitol,

23  such as bike racks and snow fencing, had already been

24  removed, torn down, or pushed aside by the crowd by the time

25  that Mr. Coffee approached the Capitol at around 4:00 p.m.,

1    I nevertheless find beyond a reasonable doubt that

2    Mr. Coffee acted knowingly when entering and remaining in

3    the tunnel.  Particularly, when approaching the mouth of the

4    tunnel, there were alarms sounding, a line of officers in

5    riot gear attempting to push back rioters, projectiles being

6    shot into and tear gas being deployed on the crowd.

7    Mr. Coffee's own witness stated rioters pushed out of the

8    tunnel by police were falling and piling up on each other.

9    This can be found in Day 2 of the trial transcript at Page

10   468.  Police officers were additionally shouting commands

11   for individuals to get back and leave the area.  This can be

12   found at Day 2 of the trial transcript at 355.  These were

13   all ample warnings to stay away and that the area was not

14   open to the public.  Mr. Coffee walked past the collapsed

15   bike racks to the entrance of the tunnel.  This can be found

16   at Day 2 of the trial transcript at Page 467.  Mr. Coffee

17   conceded that he saw the tear gas and projectiles, people

18   breaking windows, and the police with riot shields.  This

19   can be found at Day 3 of the trial transcript at Page 643

20   through 54 and Page 738 through 44 and Page 763, and yet he

21   continued to make his way to the mouth of the tunnel.  He

22   stated that he knew he was not supposed to be in the tunnel.

23   This is at Day 4 of the trial transcript at 849 through 50.

24   He additionally conceded that the gas deployed by police

25   officers was a signal, quote, "to get the hell out of the

34

1    tunnel because it's not permitted," close quote, for people

2    to enter, Day 3 of the trial transcript at 661, and that the

3    police response indicated that police would not want him to

4    enter the tunnel.  This is the same transcript at Page 744.

5    Despite this, he admitted that he entered the tunnel.  This

6    is Day 4 of the trial transcript at 851.  In fact, the

7    defendant's own witness, Steven Hill, a former police

8    officer and police trainer, concurred that any reasonable

9    person would know that they could not enter the tunnel.

10    This is at Day 3 of the trial transcript at Page 472.

11            The videos also show that after approaching the

12    mouth of the tunnel, Mr. Coffee was pepper-sprayed.  This is

13    Exhibit-405 at Timestamp 0:00 through 04.  In fact, he was

14    sprayed more than once.  This is Day 3 of the trial

15    transcript at Pages 675 and 678.  The videos also show that

16    others in the crowd turned and walked away unimpeded, but

17    Mr. Coffee stayed at the mouth of the tunnel and then

18    decided to push further inward.  Having himself been

19    pepper-sprayed, in addition to all the other evidence, makes

20    it abundantly clear that Coffee acted knowingly in entering

21    and remaining in the restricted area.  There was nothing

22    ignorant, mistaken, or accidental about his presence there,

23    nor could he have reasonably believed his presence was

24    lawful.

25            Mr. Coffee's own statements after the event are

1    also strongly suggestive that he knew he and the other

2    members of the crowd were in a restricted area and not

3    permitted to enter the tunnel on the west front of the

4    Capitol.  Although Mr. Coffee testified that he used the

5    phrase sarcastically, the very day after the riot,

6    Mr. Coffee expressed that he had, quote, "stormed the

7    Capitol," closed quote, on January 6th.  This is Day 3 of

8    the trial transcript at 770 through 72.  The word "storm,"

9    which connotes capturing an area by means of force, suggests

10   that Mr. Coffee knew the Capitol was not open to the public

11   on January 6th.

12            As an additional element, the defense argues that

13   the Government must show that Mr. Coffee knew that the vice

14   president would be visiting the building on January 6th.

15   This issue had split the courts in this district previously.

16   I have previously rejected this argument and, in recent

17   weeks, the Circuit in United States v. Griffin, Case

18   No. 22-3042, confirmed that my earlier interpretation was

19   correct.  As the Circuit explained, the statute's text,

20   structure, and history of Section 1752(c)(1)(B) all indicate

21   that the "Secret Service protectee" requirement serves only

22   a jurisdictional purpose, and now binding Circuit precedent

23   has held that the statute does not require the "knowingly"

24   mens rea to extend to reach, as the defense urges, the U.S.

25   Secret Service protectee's presence requirement which,

1      again, is not substantive but only a jurisdictional element.

2              I also find beyond a reasonable doubt that

3      Mr. Coffee carried and used a deadly or dangerous weapon in

4      relation to this offense.  As I previously described, the

5      metallic crutch that Coffee held above his head and then

6      lowered to ram into the officers constitutes a deadly or

7      dangerous weapon.  The defense argues that Mr. Coffee may

8      only be convicted of the enhancement if he used the crutch

9      to accomplish his entering into a restricted area.  I

10     disagree.  The statute makes clear, using the disjunctive

11     "or," that a person satisfies the enhancement if he uses or

12     carries a deadly or dangerous weapon.  That said, Mr. Coffee

13     both carried the metallic crutch while in the restricted

14     area and used the crutch to push further into the Capitol.

15     I find beyond a reasonable doubt that Mr. Coffee's conduct

16     meets the element of the deadly or dangerous weapon

17     enhancement.

18             Accordingly, I find the Government has proven each

19     of these elements beyond a reasonable doubt and find

20     Mr. Coffee guilty as charged with respect to Count 4.

21             Count 5, disorderly conduct in a restricted

22     building or grounds.

23             Count 5 of the indictment charges Mr. Coffee with

24     disorderly or disruptive conduct in a restricted building or

25     grounds, in violation of 18 U.S.C. Section 1752(a)(2) and

1    (b)(1)(A).  In order to find Mr. Coffee guilty of this

2    offense, I must find that the Government proved each of the

3    following elements beyond a reasonable doubt:

4            First, that the defendant engaged in disorderly or

5    disruptive conduct in or in proximity to any restricted

6    building or grounds.

7            Second, that the defendant did so knowingly and

8    with the intent to impede or disrupt the orderly conduct of

9    Government business or official functions.

10           Third, that the defendant's conduct occurred when

11   or so that his conduct, in fact, impeded or disrupted the

12   orderly conduct of government business or official

13   functions.

14           And, fourth, the defendant knowingly, during and

15   in relation to the offense, used or carried a deadly or

16   dangerous weapon.

17           For the lesser included offense, the Court need

18   not find the fourth element.

19           As I previously discussed with respect to Count 4,

20   I find beyond a reasonable doubt that the entrance to the

21   tunnel on the lower west terrace was within the restricted

22   grounds.  And I find that Mr. Coffee was in that area and

23   entered the tunnel.

24           I also find that Mr. Coffee engaged in disorderly

25   and disruptive conduct in that area.  Disorderly conduct is

conduct that, when viewed in the circumstances in which it takes place, is likely to endanger public safety or create a public disturbance.  Even passive, quiet, and non-violent conduct can be disorderly if the conduct is likely to cause a public disturbance.  Disruptive conduct is conduct that, when viewed in the circumstances in which it takes place, tends to interfere with or inhibit usual proceedings.  This includes conduct that causes disorder or turmoil or that stops or prevents the normal continuance of an activity. Whether particular conduct is disruptive depends on the context and surrounding circumstances and includes conduct that is plainly out of place for the time or setting where it occurs.  This is all set forth by the Circuit in *United States v. Alford*, 89 F.4th 943 at Pages 949 through 52, D.C. Circuit 2024.

I find beyond a reasonable doubt that Mr. Coffee engaged in disorderly and disruptive conduct.  For one thing, his presence and participation in the violent mob that attacked the Capitol on January 6th was, in and of itself, disorderly and disruptive because it contributed to disturbing the peace and disrupting the normal and orderly business of the Capitol and its occupants on that day.  As the Circuit in *Alford* set forth, it explained that defendant's actions were disorderly and disruptive conduct because simply his unauthorized presence at the Capitol,

1    alongside dozens of others, directly contributed to the

2    Congress's need to recess to ensure the safety of its

3    members as well as the police on the scene.  This is the

4    same holding as District Court judges in *United States v.*

5    *Rivera* and *United States v. Ballenger* held.  Simply by being

6    there, Mr. Coffee increased the chaos at the Capitol, the

7    police's difficulty in restoring order, and the likelihood

8    of interference with the Congress's work.  That's *Alford* at

9    89 F.4th at 953.

10          But it is clear from the evidence presented at

11   trial that the defendant's mere presence in the mob was not

12   the only disorderly or disruptive act that he engaged in

13   within the restricted area of the Capitol grounds.

14   Mr. Coffee's actions -- twice charging headlong into the

15   police line with a metallic crutch and then swinging the

16   crutch in the officers' direction -- doubtlessly comes

17   within that definition.  Rather than mere presence in a mob,

18   Mr. Coffee actively engaged in the violence of that mob.

19          As for the second element, I find beyond a

20   reasonable doubt that Mr. Coffee engaged in all of this

21   conduct knowingly and not as a result of ignorance, mistake,

22   or accident.  I further find that he acted with the specific

23   intent of impeding or disrupting the orderly conduct of

24   government business and official functions; namely, the

25   Capitol Police officers' efforts to secure the Capitol

grounds.  I found with respect to Count 1 that he acted with
the specific intent of obstructing, impeding -- as I found
with respect to Count 1, he acted with the specific intent
of obstructing, impeding, or interfering with the law
enforcement officers protecting the Capitol grounds
perimeter.  Evidence of that intent included the defendant's
efforts to make his way to the front of the mass of the
rioters, gather himself, and run straight into the police
lines guarding the tunnel, shoving the crutch against the
officers in an effort to push them back, and later angrily
swinging it at Officer Sajumon.  I find that this same
evidence establishes defendant's intent to impede or disrupt
the orderly conduct of the Capitol Police and other law
enforcement officers in establishing a perimeter around the
Capitol grounds and pushing the rioters out of the tunnel
which represents both government business and an official
function.

          In addition, I may infer that a person intends the
natural and probable consequences of his actions.  The
natural and probable consequences of pushing into the tunnel
with a horizontally-held crutch used as a plow against the
lines of law enforcement officers attempting to protect the
Capitol grounds and the tunnel is that those actions will
impede or disrupt the orderly conduct of government business
or official functions.  I infer Mr. Coffee's intent from

1    these actions.  And, as previously stated, these actions

2    were not reflexive or due to having been blinded by OC spray

3    or other chemical irritants.

4         With respect to the third element, I also find

5    that Mr. Coffee's conduct, in fact, impeded the orderly

6    conduct of government business that day.  With regard to

7    Count 1, I found that the defendant's actions, in fact,

8    obstructed, impeded, and interfered with law enforcement

9    officers' efforts to secure the Capitol grounds and the

10   tunnel.  Those same actions impeded the orderly conduct of

11   law enforcement officers engaged in that government business

12   and official function.  As the officers testified, the riot

13   on the west front -- where Coffee was located -- was taxing

14   on their manpower and prevented them from stopping rioters

15   from breaching further into the building and disrupting the

16   electoral vote count.  That's at Day 1 of the trial

17   transcript at Page 111.  In addition, the House and the

18   Senate were adjourned and evacuated due to the riot.  And as

19   Officer Brooks testified, the official certification of the

20   2020 election had to be suspended so that Congress could

21   evacuate to safety.  That's Day 1 of the trial transcript at

22   126.  In the end, as a direct result of the defendant's

23   conduct in concert with other rioters, Congress could not

24   resume its business until late that evening.  Although

25   defendant was only one member of the mob, and although he

1    was only at the Capitol for part of the afternoon, his

2    conduct was nonetheless an impediment to governmental

3    functions.  This is as set forth in *Alford*, 89 F.4th at 952

4    through 53 in which the Circuit affirmed the defendant's

5    Section 1752(a)(2) conviction where defendant's mere

6    presence in the Capitol contributed to the Congress's

7    multi-hour delay in completing the electoral certification.

8              Finally, for reasons I explained while discussing

9    Counts 2 through 4, I also find beyond a reasonable doubt

10   that Mr. Coffee carried and used a deadly or dangerous

11   weapon while in the restricted area and in relation to his

12   disorderly and disruptive conduct.

13             Accordingly, I find that the Government has proved

14   each of these elements beyond a reasonable doubt and I find

15   Mr. Coffee guilty as charged in Count 5.

16             Count 6 is impeding ingress and egress in a

17   restricted building or grounds with a deadly or dangerous

18   weapon.  That charge was dismissed by the Government before

19   trial on January 22nd, 2024.

20             Count 7 is engaging in physical violence in a

21   restricted building or grounds.

22             Count 7 of the indictment charges Mr. Coffee with

23   engaging in an act of physical violence in a restricted

24   building or grounds which is a violation of 18 U.S.C. 1752

25   (a)(4) and (b)(1).  The elements that I must find beyond a

1     reasonable doubt for this offense are:

2                First, that the defendant engaged in any act of

3     physical violence against any person in any restricted

4     building or grounds.

5                Second, that the defendant did so knowingly.

6                Third, that the defendant knowingly, during, and

7     in relation to the offense, used or carried a deadly or

8     dangerous weapon.

9                For the lesser included offense, the Court need

10    not find the third element.

11               Much of the previously discussed reasoning applies

12    here.  First, the lower west terrace of the Capitol and the

13    tunnel were restricted areas on January 6th, 2021.  And, as

14    previously discussed, there is no question that the

15    defendant was at the mouth of the tunnel and entered the

16    tunnel.

17               Next, an act of physical violence means any act

18    involving an assault or other infliction or threat of

19    infliction of death or bodily harm on an individual; or

20    damage to, or destruction of, real or personal property.

21    Mr. Coffee engaged in multiple acts of physical violence;

22    namely, twice ramming the line of officers with the metallic

23    crutch and then swinging the crutch in the officers'

24    direction.  These acts are captured on multiple videos and

25    were testified to by the officers.  At the very least, these

1    acts threatened bodily harm to these officers.

2    Mr. Coffee committed these acts knowingly for the

3    same reasons previously described.  He did not mistakenly

4    arrive to the police line.  He rammed forward two separate

5    times and then swung the crutch at the police line.  As

6    previously discussed, he did not act reflexively or

7    involuntarily due to the effects of chemical irritants.

8    For reasons I explained with respect to the

9    earlier counts, I also find beyond a reasonable doubt that

10   Mr. Coffee carried and used a deadly or dangerous weapon

11   while in the restricted area and in relation to his conduct.

12   Accordingly, I find that the Government has proven

13   beyond a reasonable doubt that Mr. Coffee is guilty as

14   charged in Count 7.

15   Count 8 is disorderly conduct in a Capitol

16   building or grounds.

17   Count 8 of the indictment charges Mr. Coffee with

18   disorderly conduct in a Capitol building or grounds, in

19   violation of 40 U.S.C. Section 5104(e)(2)(D).  The elements

20   of this offense, which the Government must prove beyond a

21   reasonable doubt, are:

22   First, that the defendant engaged in disorderly or

23   disruptive conduct in any of the United States Capitol

24   buildings or grounds.

25   Second, that the defendant did so with the intent

1    to impede, disrupt, or disturb the orderly conduct of a

2    session of Congress or either house of Congress.

3          Third, that the defendant acted willfully and

4    knowingly.

5          My previous finding that the defendant engaged in

6    disorderly and disruptive conduct applies with equal force

7    to this count.  I also find beyond a reasonable doubt that

8    Mr. Coffee was in a U.S. Capitol building or, at the very

9    least, on Capitol grounds when he engaged the police

10   officers in and around the tunnel.  These two findings

11   resolve the first element.

12         Regarding the third element of the offense, I find

13   that the defendant engaged in this disorderly and disruptive

14   conduct willfully and knowingly.  A person acts willfully if

15   he acts with the intent to do something that the law

16   forbids; that is, to disobey or disregard the law.

17   Mr. Coffee realized what he was doing and was aware of the

18   nature of his actions when he entered the tunnel, charged at

19   the officers with a horizontally-held crutch, plowed into

20   the officers more than once, and later swung the crutch at

21   them.  I thus conclude that the defendant did not engage in

22   disorderly or disruptive conduct as a result of ignorance,

23   mistake, or accident.

24         However, I find that the Government has not

25   carried its burden to prove the second element of the

1    offense as to the defendant.  The evidence does not show

2    beyond a reasonable doubt that Mr. Coffee acted with the

3    intent to impede, disrupt, or disturb the orderly conduct of

4    a session of Congress or either house of Congress.  To be

5    sure, there is some evidence as to his intent.  For one,

6    defendant undertook significant effort to reach the mouth of

7    the tunnel.  And previously, he was at the Stop the Steal

8    rally and heard at least part of President Trump's speech.

9    This can be found at Day 3 of the trial transcript at Pages

10   630 through 32 and Page 729.  But defendant testified that

11   he was more focused on recording individuals at the Stop the

12   Steal rally for a potential documentary.  This can be found

13   at Day 3 of the trial transcript at 608, 609, and Page 728.

14           Although the day after the riot, defendant sent a

15   message indicating that, quote, "we wanted to go inside once

16   Pence played his lie," closed quote, Government's

17   Exhibit-650, this after-the-fact communication made after

18   Coffee had learned more about what happened on January 6th

19   implies he knew about the certification at the time of the

20   riot, but it is not directly tied to his contemporaneous

21   motivations.  Thus, I do not find this evidence in and of

22   itself sufficient to prove beyond a reasonable doubt that

23   defendant intended to impede, disrupt, or disturb the

24   orderly conduct of a session of Congress or either house of

25   Congress.  In other cases where courts have found evidence

1    sufficient to satisfy this element, the Government has

2    mostly presented more inculpatory statements made before the

3    riot by the defendant.  For example, other defendants

4    convicted of this charge referred prior to the riot to

5    revolution or expressed a hope to remove members of Congress

6    from the Capitol.  But here, it is equally plausible that

7    Mr. Coffee's actions in the tunnel were motivated by rage

8    and anger at the officers in the tunnel and he simply lashed

9    out at them.

10          In sum, I find that the Government has not proved

11   the second element of Count 8 beyond a reasonable doubt as

12   to the defendant, and I find Mr. Coffee not guilty of Count

13   8.

14          With respect to Count 9, impeding passage through

15   the Capitol grounds or buildings, this charge was dismissed

16   by the Government before trial on January 22nd, 2024.

17          Finally, it leads us to Count 10, an act of

18   physical violence in the Capitol grounds or building.

19          Count 10 of the indictment charges Mr. Coffee with

20   engaging in an act of physical violence in the Capitol

21   building or grounds, in violation of 40 U.S.C. Section

22   5104(e)(2)(F).  The elements for this offense that I must

23   find beyond a reasonable doubt are:

24          First, that the defendant engaged in any act of

25   physical violence in any of the United States Capitol

1     building or grounds.

2          Second, that the defendant acted willfully and

3     knowingly.

4          Most of these elements have already been

5     addressed.  I find that Mr. Coffee engaged in an act of

6     physical violence for the same reasons described in Count 7

7     and that he did so within the Capitol buildings and grounds

8     as described in Count 8.

9          As for the second element, I find that Mr. Coffee

10    engaged in both of these acts knowingly and willfully.  I

11    have already explained as to Counts 5 and 7 that Mr. Coffee

12    knowingly engaged in the actions just described.  He

13    realized what he was doing and he was aware of the nature of

14    his conduct; at no point were his actions the result of

15    ignorance, mistake, or accident.  Mr. Coffee also acted

16    willfully.  A person acts willfully if he acts with the

17    intent to do something that the law forbids; that is, to

18    disobey or disregard the law.  The Government must show that

19    the defendant knew that the conduct was unlawful, but the

20    Government does not need to prove that the defendant was

21    aware of the specific law that his conduct violated.  Here,

22    there is ample evidence that Mr. Coffee knew what he was

23    doing was unlawful.  The evidence shows that he knew he was

24    not permitted to be on Capitol grounds or, at the very

25    least, in the tunnel, yet he went and remained there as part

1  of the mob of the rioters anyway.  He knew that there were

2  police stationed in the tunnel, yet he actively joined in

3  the crowd's concerted effort to prevent those officers from

4  defending the Capitol building and clearing the tunnel.  He

5  was later sprayed with OC spray by those same officers, yet

6  he continued to try to force his way inside the tunnel,

7  charging and attacking the officers therein.  Mr. Coffee

8  could not reasonably have thought that any of these actions

9  were lawful.  To the contrary, the evidence shows that he

10  knew they were not.

11          Accordingly, I find beyond a reasonable doubt that

12  the Government has proved each element of Count 10, and

13  Mr. Coffee is guilty as charged therein.

14          In summary, I have found Mr. Coffee guilty of

15  Counts 1, 2, 3, 4, 5, 7, and 10 pursued by the Government at

16  trial.  Counts 6 and 9 were dismissed by the Government

17  before trial.  And I have acquitted defendant of Count 8.

18          All right.  Mr. Sabatini, do you have your

19  calendar?

20          MR. SABATINI:  Yes, Your Honor.

21          THE COURT:  For purposes of sentencing, how does

22  the week of April 22nd look?

23          MR. SABATINI:  The 22nd, Your Honor; is that

24  correct?

25          THE COURT:  That week, yeah.  Not that particular

1    day necessarily.

2            MR. SABATINI:  The only day I couldn't do is

3    Tuesday, Your Honor.

4            THE COURT:  Okay.  Do you have a preference of the

5    other days?

6            MR. SABATINI:  If I had to choose one, I would say

7    Thursday, Your Honor.

8            MS. DERANEK:  Is that Thursday the 24th, Your

9    Honor?

10           THE COURT:  I don't have a calendar in front of

11   me, but --

12           THE DEPUTY CLERK:  It is.  April 24th.  10:00 a.m.

13           MS. DERANEK:  Yes, that will work for the

14   Government.  And whenever it is appropriate, we do intend to

15   argue for step-back.

16           THE COURT:  Okay.  Do you have a preference,

17   morning or afternoon?

18           MR. SABATINI:  Morning, Your Honor.

19           THE DEPUTY CLERK:  10:00 a.m.

20           THE COURT:  10:00 a.m.

21           MR. SABATINI:  10:00 a.m.  Thank you.

22           THE COURT:  So that's Thursday, April 24th, at

23   10:00 a.m.

24           MR. SABATINI:  Thank you, Your Honor.

25           THE COURT:  Is there anything else we need to

1    resolve today?

2        MS. DERANEK:  Your Honor, would this be an

3    appropriate time for argument for a step-back?

4        THE COURT:  I'm not going to step him back, but

5    you can -- if you want to make a record.

6        MS. DERANEK:  Please, Your Honor.

7        THE COURT:  All right.

8        MS. DERANEK:  Your Honor, in light of your verdict

9    finding the defendant guilty of everything except the (1)(b)

10   misdemeanor, including several felonies, we would

11   respectfully ask that Your Honor immediately remand the

12   defendant into custody.  I believe that based on a statute,

13   it is mandatory.  Specifically, looking at 18 U.S.C. 3143,

14   the language governing detention of a defendant pending

15   sentencing in this case uses the mandatory verb "shall."  In

16   relevant part, it says that "the judicial officer shall

17   order that a person who has been found guilty of an offense"

18   described in the subparagraph, which would encompass several

19   of the offenses that he was convicted of today and is

20   awaiting imposition of execution of sentence, be detained

21   unless there are a number of co-occurring conditions that

22   don't all exist here.  Specifically, you would have to find

23   that there is a substantial likelihood that a motion for

24   acquittal or new trial will be granted or an attorney for

25   the Government has recommended that no sentence of

1    imprisonment be imposed on the person, and you would also

2    have to find that, by clear and convincing evidence, he is

3    not likely to flee or pose a danger to any other person or

4    the community.

5            Here, the defendant was convicted of 18 U.S.C.

6    111(b) which qualifies as a crime of violence under 18

7    U.S.C. 3142(f)(1)(A); therefore, his detention is mandatory

8    in absence of those co-occurring conditions which I don't

9    think exist here.  We certainly plan on recommending an

10   incarceratory sentence, and given your extremely thorough

11   verdict, I don't think there is a substantial likelihood of

12   success on a motion of acquittal or new trial.

13           Furthermore, this defendant presents both a flight

14   risk and a danger to the community.  As you may recall from

15   the trial, when the defendant was initially implicated in

16   this case, he fled to a luxurious Hill Country resort with a

17   sympathetic owner for several weeks.  At that point, he had

18   not even been charged yet, let alone convicted --

19           MS. STEWART:  Objection, Your Honor.  Objection,

20   Your Honor.  Facts --

21           THE COURT:  She's --

22           MS. STEWART:  -- not in evidence.

23           THE COURT:  She's making her case.

24           Go ahead.

25           MS. STEWART:  All right.

1          MS. DERANEK:  He hadn't been charged with the

2     cases -- the crimes on January 6th.  He has a much greater

3     incentive to flee now when he's facing significant

4     incarceration as a result of his convictions.

5          And, moreover, it in terms of danger to the

6     community, the defendant represents a danger to the

7     community because of the violent nature of these offenses

8     combined with the extraordinary amount of disinformation

9     that he has released and continues to release into the world

10    about this case.  The defendant is proud of what he did on

11    January 6th and he has made it clear that he would do it

12    again.  Since this trial, he has continued to propagate

13    misinformation about what happened that day through his

14    social media channels and in interviews and he's presented

15    himself as a hero.  Because he's proud of what he did, he

16    has put forth innumerable lies that are of the very type

17    that caused many of those who went to the Capitol and

18    committed violence on January 6th to go down that path in

19    the first place.  Nowhere is this more apparent than in his

20    mistreatment of and misinformation about Officer Morris, who

21    testified in this trial.  Officer Morris was the defendant's

22    victim.  Full stop.  And after he attacked her and other law

23    enforcement officers physically at the Capitol on January

24    6th, he has continued to attack her relentlessly online.

25    Before, during, and since his trial, he has repeatedly

1    propagated the false narrative that Officer Morris was

2    responsible for Roseanne Boyland's death.  For instance, on

3    March 21st of 2024, he posted a speech by Laura [sic] Logan

4    claiming that Officer Morris killed Roseanne Boyland on both

5    Instagram and X.  He posted again on the subject the next

6    day.  He did an interview with Alex Stein on June 4th, 2024,

7    in which he was lauded as a hero.  He reposted the

8    Laura [sic] Logan speech again on September 17th as well as

9    an image of Officer Morris with the words "Roseanne Boyland,

10   the real coverup, murdered by Capitol Police; cause of

11   death, baton."  Let's put these lies to rest right now.

12   Officer Morris had nothing to do with Roseanne Boyland's

13   death.  Roseanne Boyland was not killed by Officer Morris or

14   any of the other officers defending the Capitol that day.

15   She died of a tragic overdose.

16            Furthermore, a New York Times video analysis

17   concluded that it was, in fact, the defendant's actions that

18   prevented the officers from rendering her aid as she lay

19   dying that day.  The defendant is out there blaming this

20   brave police officer for what he did and making her life

21   miserable.  She and her loved ones have been the target of

22   constant, vicious harassment online because of the lies that

23   the defendant has helped spread to absolve himself of

24   responsibility for his own actions.  Officer Morris is the

25   true hero.  She is a valued member of our community.  She

 1    put her life on the line on January 6th to protect our

 2    community and our nation, and she and her loved ones are not

 3    safe while the defendant is out on release; therefore, we

 4    would ask Your Honor to remand the defendant into custody.

 5              THE COURT:  All right.  Before this moment, has

 6    the Government ever notified the Court or the defendant that

 7    you were going to be seeking a step-back?

 8              MS. DERANEK:  I have not.  I don't believe that

 9    that's required by the statute.

10              THE COURT:  It's not required, but it's required

11    in my court.  So if you want me to take him into custody

12    before April, file a written motion.

13              MS. DERANEK:  Understood.  Thank you, Your Honor.

14              THE COURT:  All right.  Anything else we need to

15    resolve?

16              MR. SABATINI:  No, Your Honor.

17              THE COURT:  All right.  Thank you.  You're

18    excused.

19              MR. SABATINI:  Thank you, Your Honor.

20              THE COURT:  Have a good weekend.

21              (Proceedings concluded at 3:26 p.m.)

22                    * * * * * * * * * * *

23              **CERTIFICATE OF OFFICIAL COURT REPORTER**

24    **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

25    **that the above and foregoing constitutes a true and accurate**

1    transcript of my stenographic notes and is a full, true and

2    complete transcript of the proceedings to the best of my

3    ability, dated this 15th day of January 2025.

4                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
5                              United States Courthouse
                               Room 6722
6                              333 Constitution Avenue, NW
                               Washington, DC 20001

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25